# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 2 of 135

**EXECUTION**

CREDIT AGREEMENT

dated as of

June 2, 2022

among

Moshe Silber, an individual as Borrower,

The Lenders Party Hereto,

and

ACQUIOM AGENCY SERVICES LLC,

as Administrative Agent

_____

# TABLE OF CONTENTS

Page

## ARTICLE I

## DEFINITIONS

SECTION 1.01    Defined Terms ................................................................................ 1
SECTION 1.02    Terms Generally............................................................................ 24
SECTION 1.03    Accounting Terms; Changes in GAAP........................................ 24
SECTION 1.04    Rates.............................................................................................. 24

## ARTICLE II

## ARTICLE II

## COMMITMENTS AND TERM LOANS

SECTION 2.01    Commitments................................................................................. 25
SECTION 2.02    Loans and Borrowings ................................................................. 25
SECTION 2.03    Borrowing Requests..................................................................... 25
SECTION 2.04    Funding of Borrowings ................................................................ 26
SECTION 2.05    [Intentionally Omitted] ............................................................... 27
SECTION 2.06    Prepayments................................................................................. 27
SECTION 2.07    Commitments; Increase and Termination.................................... 29
SECTION 2.08    Repayment of Loans ..................................................................... 30
SECTION 2.09    Interest.......................................................................................... 30
SECTION 2.10    Fees .............................................................................................. 31
SECTION 2.11    Evidence of Debt.......................................................................... 31
SECTION 2.12    Payments Generally; Several Obligations of Lenders ............... 32
SECTION 2.13    Sharing of Payments .................................................................... 33
SECTION 2.14    Compensation for Losses ............................................................ 34
SECTION 2.15    Increased Costs ............................................................................ 34
SECTION 2.16    Taxes ............................................................................................ 35
SECTION 2.17    Inability to Determine Rates ....................................................... 39
SECTION 2.18    Illegality ....................................................................................... 40
SECTION 2.19    Mitigation Obligations; Replacement of Lenders...................... 40
SECTION 2.20    Benchmark Replacement Setting................................................. 41
SECTION 2.21    Defaulting Lenders....................................................................... 42

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

SECTION 3.01    Existence, Qualification and Power; Domicile and Primary
                Residence. ..................................................................................... 44
SECTION 3.02    Authorization; No Contravention ................................................ 44

- i -

SECTION 3.03    Governmental Authorization; Other Consents..........................................45
SECTION 3.04    Execution and Delivery; Binding Effect.................................................45
SECTION 3.05    Financial Statements; No Material Adverse Effect ................................45
SECTION 3.06    Litigation...................................................................................................45
SECTION 3.07    No Default..................................................................................................45
SECTION 3.08    Property......................................................................................................46
SECTION 3.09    Taxes..........................................................................................................46
SECTION 3.10    Disclosure..................................................................................................46
SECTION 3.11    Compliance with Laws .............................................................................46
SECTION 3.12    Environmental Matters..............................................................................46
SECTION 3.13    Margin Regulations...................................................................................46
SECTION 3.14    Sanctions; Anti-Corruption.......................................................................47
SECTION 3.15    Collateral Documents; Collateral..............................................................47
SECTION 3.16    Organizational Structure...........................................................................47
SECTION 3.17    Solvency.....................................................................................................47

## ARTICLE IV

## CONDITIONS

SECTION 4.01    Closing Date...............................................................................................47
SECTION 4.02    Conditions to the Making of Each Term Loan .........................................50

## ARTICLE V

## AFFIRMATIVE COVENANTS

SECTION 5.01    Financial Statements .................................................................................52
SECTION 5.02    Certificates; Other Information..................................................................53
SECTION 5.03    Notices ......................................................................................................53
SECTION 5.04    Preservation of Existence, Etc ..................................................................54
SECTION 5.05    Maintenance of Properties ........................................................................54
SECTION 5.06    Payment of Obligations..............................................................................54
SECTION 5.07    Maintenance of Insurance..........................................................................55
SECTION 5.08    Compliance with Laws ..............................................................................55
SECTION 5.09    Environmental Matters...............................................................................55
SECTION 5.10    Books and Records ....................................................................................55
SECTION 5.11    Inspection and Audit Rights.......................................................................55
SECTION 5.12    Use of Proceeds..........................................................................................56
SECTION 5.13    Sanctions; Anti-Corruption Laws..............................................................56
SECTION 5.14    Borrowing Base Management.....................................................................56
SECTION 5.15    Protection of Collateral and Liens; Further Assurances ...........................59
SECTION 5.16    Development and Redevelopment ..............................................................60

## ARTICLE VI

## NEGATIVE COVENANTS

| SECTION 6.01 | Indebtedness | 60 |
| SECTION 6.02 | Liens | 61 |
| SECTION 6.03 | Dispositions | 61 |
| SECTION 6.04 | Investments | 62 |
| SECTION 6.05 | Restriction on Use of Proceeds; Margin Regulations; Crypto Assets | 63 |
| SECTION 6.06 | Restriction on Amendments to Organizational Documents and Consents; Residence | 63 |
| SECTION 6.07 | Sanctions; Anti-Corruption Use of Proceeds | 64 |
| SECTION 6.08 | Financial Covenants | 64 |
| SECTION 6.09 | Bank Asset Account | 64 |
| SECTION 6.10 | Limitation on Business of Designated LLCs.. | 65 |

## ARTICLE VII

## EVENTS OF DEFAULT

| SECTION 7.01 | Events of Default | 65 |
| SECTION 7.02 | Application of Payments | 68 |

## ARTICLE VIII

## AGENCY

| SECTION 8.01 | Appointment and Authority | 71 |
| SECTION 8.02 | Rights as a Lender | 71 |
| SECTION 8.03 | Exculpatory Provisions | 71 |
| SECTION 8.04 | Reliance by Administrative Agent | 73 |
| SECTION 8.05 | Delegation of Duties | 73 |
| SECTION 8.06 | Resignation of Administrative Agent | 73 |
| SECTION 8.07 | Non-Reliance on Administrative Agent and Other Lenders | 74 |
| SECTION 8.08 | [Reserved] | 75 |
| SECTION 8.09 | Administrative Agent May File Proofs of Claim | 75 |
| SECTION 8.10 | Collateral and Guaranty Matters | 75 |
| SECTION 8.11 | Erroneous Payments | 76 |

## ARTICLE IX

## MISCELLANEOUS

| SECTION 9.01 | Notices; Public Information | 78 |
| SECTION 9.02 | Waivers; Amendments | 79 |
| SECTION 9.03 | Expenses; Indemnity; Damage Waive | 80 |

SECTION 9.04    Successors and Assigns................................................................ 82
SECTION 9.05    Survival ........................................................................................ 86
SECTION 9.06    Counterparts; Integration; Effectiveness; Electronic Execution............... 87
SECTION 9.07    Severability ................................................................................... 87
SECTION 9.08    Right of Setoff............................................................................... 87
SECTION 9.09    Governing Law; Jurisdiction; Etc ................................................. 88
SECTION 9.10    WAIVER OF JURY TRIAL............................................................. 89
SECTION 9.11    Headings ....................................................................................... 89
SECTION 9.12    Treatment of Certain Information; Confidentiality................................. 89
SECTION 9.13    PATRIOT Act ................................................................................ 90
SECTION 9.14    Interest Rate Limitation ................................................................ 90
SECTION 9.15    Payments Set Aside....................................................................... 91
SECTION 9.16    No Advisory or Fiduciary Responsibility .................................... 91

SCHEDULES

SCHEDULE 1.01     -     Borrowing Base
SCHEDULE 2.01     -     Commitments and Lenders
SCHEDULE 3.01     -     Domicile; Primary Residence
SCHEDULE 3.06     -     Litigation
SCHEDULE 3.16     -     Organizational Structure
SCHEDULE 9.01(a)  -     Notice Addresses; Administrative Forms

EXHIBITS

EXHIBIT A     -     Assignment and Assumption
EXHIBIT B     -     Form of Borrowing Request
EXHIBIT C     -     Form of Borrowing Base Certificate
EXHIBIT D-1   -     Form of U.S. Tax Compliance Certificate
EXHIBIT D-2   -     Form of U.S. Tax Compliance Certificate
EXHIBIT D-3   -     Form of U.S. Tax Compliance Certificate
EXHIBIT D-4   -     Form of U.S. Tax Compliance Certificate
EXHIBIT E     -     Form of Personal Financial Statement

KL2 3279308.20

CREDIT AGREEMENT, dated as of June 2, 2022 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), among Moshe Silber, an individual, the Lenders party hereto, and ACQUIOM AGENCY SERVICES LLC, as administrative agent and collateral agent (collectively, the "Administrative Agent").

The Borrower (as defined below) has requested that the Lenders make Term Loans to the Borrower, and the Lenders are willing to do so on the terms and conditions set forth herein. In consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"1940 Act" has the meaning specified in the definition of Qualified Purchaser.

"Adjusted Term SOFR" means, for any Interest Period, the rate per annum equal to (a) Term SOFR in effect for such Interest Period plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then the Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent Fee Letter" means the fee letter dated the Closing Date between the Borrower and the Administrative Agent.

"Administrative Agent" has the meaning specified in the preamble.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth in Section 9.01, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" has the meaning specified in introductory paragraph hereof.

"Applicable Law" means, as to any Person, all applicable Laws binding upon such Person or to which such a Person is subject.

"Applicable Margin" means (i) as to any SOFR Loan, 9.75% per annum and (ii) as to any Prime Rate Loan, 6.00%.

"Applicable Percentage" means, with respect to any Lender, the percentage of the total Commitments represented by such Lender's Commitment.  If the Commitments have

terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"Applicable Threshold Amount" means $2,000,000 aggregate principal amount, provided that with respect to all Indebtedness that satisfies each of the following three conditions, the Applicable Threshold Amount shall be $15,000,000 aggregate principal amount: (i) not Indebtedness on which either CBRM Realty or Crown Capital is directly obligated, (ii) not Indebtedness on which the Borrower is personally obligated or Indebtedness that is guaranteed by any Loan Party, and (iii) not Specified Indebtedness.

"Approved Appraiser" means any of CBRE, C&W, JLL, Colliers, and BBG and any other appraiser selected by Borrower that is reasonably acceptable to the Required Lenders.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) managed by UBS O'Connor LLC or its affiliates, (c) an Affiliate of a Lender, or (d) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, as of any date of determination, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Availability Period" means the period from and including the Closing Date to but excluding the Commitment Termination Date.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.20(d).

"Bank Asset Account" means the deposit account with account number 1504931958 opened at the Depository in the name of Moshe Silber with a security interest in favor of Acquiom Agency Services LLC, or any other bank account and bank reasonably acceptable to the Lenders, in each case, in which certain amounts are deposited as set forth in this Agreement.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the

KL2 3279308.20

then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.20(a).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)       the sum of (i) Daily Simple SOFR and (ii) 0.11448%; and

(b)       the Prime Rate.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means a date and time determined by the Administrative Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)       in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)       in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence

of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.20 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.20.

"Borrower" means Moshe Silber, an individual residing as of the Closing Date at 41 Powder Horn Drive, Suffern, NY 10901.

"Borrowing" means a borrowing consisting of simultaneous Term Loans of the same Type.

KL2 3279308.20

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4
Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 11 of 135
INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

"Borrowing Base" means, as of any date, the aggregate of the Borrowing Base Contributions for all Specified Real Property Assets as of such date and all amounts on deposit in the Bank Asset Account as of such date.

"Borrowing Base Certificate" means a certificate in the form of Exhibit C containing a calculation of the Borrowing Base.

"Borrowing Base Contribution" means, for each Specified Real Property Asset and as of any date of determination, the result equal to (i) the excess of (x) 75% of the Specified Collateral Value of such Specified Real Property Asset over (y) the Specified Collateral Indebtedness for such Specified Real Property Asset multiplied by (ii) Specified Pledged Percentage for such Specified Real Property Asset.

"Borrowing Base Deficiency" means, as of any date of determination, the amount by which the Borrowing Base as of such date is less than the Borrowing Base Minimum Amount.

"Borrowing Base Minimum Amount" means $10,000,000, provided that on the effective date of an increase in the Commitments pursuant to Section 2.07(a), the Borrowing Base Minimum Amount shall increase to $15,000,000.

"Borrowing Base Schedule" means Schedule 1.01 to this Agreement (as such schedule is modified from time to time after the Closing Date with the approval of the Lenders in their sole discretion in accordance with Section 5.14 of this Agreement).

"Borrowing Request" means a request for a Borrowing, which shall be in the form of Exhibit B.

"Business Day" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the Laws of the State of New York or is a day on which banking institutions in such state are authorized or required by Law to close.

"Capitalized Lease" means each lease that has been or is required to be, in accordance with GAAP, recorded as a capitalized lease.

"Cash Equivalents" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from a Credit Rating Agency;

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any

- 5 -

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024

RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 12 of 135

commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA and Aaa (or equivalent rating) by at least two Credit Rating Agencies and (iii) have portfolio assets of at least $5,000,000,000.

"CBRM Realty" means CBRM Realty, Inc., a New York corporation.

"CBRM Realty Equity" means any Equity Interest in CBRM Realty that is owned, directly or indirectly, by the Borrower.

"Change in Law" means the occurrence, after the Closing Date, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 9.02.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all assets and proceeds in or upon which a Lien is granted in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to the Collateral Documents that has not been released in accordance with the Loan Documents and shall include, for the avoidance of doubt, all investments and other assets purchased or acquired by the Borrower utilizing the proceeds, whether in whole or in part, of any Term Loan.  The Collateral at any time shall include each asset that is a Specified Pledged Equity Interest, a Proposed Investment, and the Bank Asset Account and all amounts on deposit therein.

"Collateral Documents" means, collectively, the Pledge Agreement, the Deposit Account Control Agreement, and all other security agreements and other similar agreements pledging or granting a lien on Collateral, by or between any one or more of Borrower or any other Person and the Administrative Agent for the benefit of the Secured Parties, and all financing

- 6 -

statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor.

"Commitment" means with respect to each Lender on any date, the commitment of such Lender on such date to make Term Loans, expressed as an amount representing the maximum principal of such Loan, as such commitment may be reduced or increased from time to time pursuant to Section 9.04 or increased or terminated from time to time pursuant to Section 2.07. The amount of such Lender's Commitment on the Closing Date is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as applicable. The aggregate amount of the Commitments for all Lenders on the Closing Date is $20,000,000.

"Commitment Termination Date" means the earliest of

(a)     the date that is eighteen (18) months after the Closing Date, as such date may be extended by up to six months on a one time basis at the written request of the Borrower so long as (i) such request is provided to the Administrative Agent and the Lenders by the Borrower no more than 90 days and not less than 45 days prior to the then existing Commitment Termination Date, (iii) such request specifies the duration of the requested extension (which may not exceed six months after the then existing Commitment Termination Date), and (iv) such request contains a certification that (x) no Default or Event of Default has occurred and is continuing as of the date of such request and (y) the representations and warranties in the Loan Documents are true and correct as of such date in all material respects (or, in the case of any such representation or warranty already qualified by materiality, in all respects), and (v) immediately prior to the first day of the extension period, no Default or Event of Default shall have occurred or be continuing and the representations and warranties in the Loan Documents shall be true and correct in all material respects as of such date (or, in the case of any such representation or warranty already qualified by materiality, in all respects);

(b)     the date the Commitments are terminated pursuant to Section 7.01; and

(c)     the date the Commitments are terminated pursuant to Section 2.07(b).

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Prime Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.14 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of

administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings analogous thereto.

"Credit Rating Agency" means a nationally recognized credit rating agency that evaluates the financial condition of issuers of debt instruments and then assigns a rating that reflects its assessment of the issuer's ability to make debt payments.

"Crown Capital" means Crown Capital Holdings LLC, a Delaware limited liability company.

"Crown Capital Equity" means any Equity Interest in Crown Capital that is owned, directly or indirectly, by the Borrower.

"Crypto Assets" means digital coins, digital tokens and any other type of digital mediums of exchange, such as Bitcoin and Ethereum. For purposes of the Loan Documents, (i) Crypto Assets consisting of Bitcoin and Ethereum shall be valued at 75% of their fair market value and (ii) all other Crypto Assets shall be valued at $0.00.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"DC Plan" has the meaning specified in the definition of Qualified Purchaser.

"Dearborn Consent" means the letter agreement, dated on or about the Closing Date, between Fund Investment 147, LLC and RH Dearborn Redevelopment LLC.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

KL2 3279308.20

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate (before as well as after judgment) equal to with respect to any overdue principal, interest, fees or other amounts the interest rate applicable to SOFR Loans plus 5.00% per annum (provided that, with respect to a SOFR Loan, the determination of the applicable interest rate is subject to Section 2.17 and 2.18 to the extent that Loans may not be converted to, or continued as, SOFR Loans, pursuant thereto).

"Defaulting Lender" means, subject to Section 2.21(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent or the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.21(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"Deposit Account Control Agreement" means the Control Account Agreement, dated as of the Closing Date, among the Depository, the Borrower, and the Administrative Agent, covering the Bank Asset Account.

KL2 3279308.20

"Depository" means Signature Bank or any other financial institution selected by the Borrower and acceptable to the Lenders.

"Designated LLC" means each of the following, each of which is a Wholly-Owned Subsidiary of the Borrower directly owned by the Borrower: (i) CBCC 1 LLC, a Delaware limited liability company, (ii) CBCC 2 LLC, a Delaware limited liability company, (iii) CBCC 3 LLC, a Delaware limited liability company, (iv) CBCC 4 LLC, a Delaware limited liability company, and (v) CBCC 5 LLC, a Delaware limited liability company.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any property by any Person (including any sale and leaseback transaction and any issuance of Equity Interests by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith and the termination or closure of any Proposed Cash Investment.

"Dollar" and "$" mean the lawful money of the United States.

"Earnest Money Deposit" has the meaning specified in Section 9.03(a).

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 9.04(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 9.04(b)(iii)).

"Environmental Laws" means any and all Laws, including all common law, relating to pollution or the protection of health, safety or the environment or the release of any materials into the environment, including those related to Hazardous Materials, air emissions, discharges to waste or public systems and health and safety matters.

"Environmental Liability" means any liability or obligation, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly, resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment, disposal or permitting or arranging for the disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, as to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

- 10 -

"Erroneous Payment" has the meaning specified in Section 8.11.

"Event of Default" has the meaning specified in Article VII.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.19(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.16, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.16(g) and (d) any withholding Taxes imposed under FATCA.

"Family Member" means any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law (including adoptive relationships) of the Borrower, any person sharing the Borrower's household (other than a tenant or employee), a trust in which these persons (or the Borrower) have more than 50% of the beneficial interest, a foundation in which these persons (or the Borrower) control the management of assets, and any other entity in which these persons (or the Borrower) own more than 50% of the voting interests.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" has the meaning specified in Section 3.14(b).

"Federal Funds Rate" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States.

"Floor" means (i) with respect to any SOFR Loan, a rate of interest equal to 0.25% and (ii) with respect to any Prime Rate Loan, a rate of interest equal to 4.00%.

"Foreign Lender" means any Lender that is not a U.S. Person.

"Freedom Park Consent" means the Amendment to Loan Agreement and Other Loan Documents and Reaffirmation, dated on or about the Closing Date, among Freedom Park Apartments LLC, as borrower, XCAL 2021-GA-5 Mortgage Trust, as lender, and Moshe Mark Silber, as guarantor.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"GAAP" means, subject to Section 1.03, United States generally accepted accounting principles as in effect as of the date of determination thereof.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

- 12 -

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM

NYSCEF DOC. NO. 4

INDEX NO. 652265/2024

RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 19 of 135

"<u>Hazardous Materials</u>" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, and other substances or wastes of any nature regulated under or with respect to which liability or standards of conduct are imposed pursuant to any Environmental Law.

"<u>Indebtedness</u>" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all direct or contingent obligations of such Person arising under or in respect of (i) letters of credit (including standby and commercial), bankers' acceptances, demand guarantees and similar independent undertakings and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"<u>Indemnitee</u>" has the meaning specified in Section 9.03(b).

"<u>Information</u>" has the meaning specified in Section 9.12.

"<u>Interest</u>" has the meaning specified in Section 9.04(f).

KL2 3279308.20

"Interest Period" means (a) the period from and including the Closing Date to and including the last day of the calendar month in which the Closing Date occurs and (b) thereafter, the period from and including the first day of each calendar month to and including the last day of such calendar month; provided, that the final Interest Period for all outstanding Loans hereunder shall end on and include the day prior to the payment in full of the Loans hereunder.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs Indebtedness of the type referred to in clause (g) of the definition of "Indebtedness" in respect of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender Approved Sales Broker" has the meaning specified in Section 7.03(b).

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption or otherwise.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Liquidity" means, with respect to the Borrower and as of any date of determination, all cash and Cash Equivalents that are owned by, and held in the name of, the Borrower including, for the avoidance of doubt, amounts on deposit in the Bank Asset Account

and amounts constituting a Proposed Cash Investment, and that, in each case, are not subject a restriction in favor of any Person or any Lien in favor of any Person (other than (x) a customary Lien for fees and expenses in favor of the financial institution that holds such account and (y) a lien in favor of the Administrative Agent under the Loan Documents).

"Loan" means each Term Loan.

"Loan Documents" means, collectively, this Agreement, each promissory note issued pursuant to Section 2.11(b), the Administrative Agent Fee Letter, each Collateral Document, the Subsidiary Guaranty, and any other documents entered into in connection herewith.

"Loan Party" means (i) the Borrower, (ii) RH Dearborn Redevelopment JV LLC, (iii) each Subsidiary Guarantor, and (iv) each Pledged Real Estate Entity.

"Margin Stock" means margin stock within the meaning of Regulations T, U and X.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the operations, business, properties, liabilities (actual or contingent), or financial condition of any Loan Party; or (b) a material adverse effect on (i) the ability of any Loan Party to perform its Obligations, (ii) the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party or (iii) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent or any Lender under any Loan Document; provided that any change in the value of Crypto Assets shall not be considered a "Material Adverse Effect".

"Material Disposition" means, during any period of six (6) consecutive calendar months that occurs after the Closing Date, the Disposition by the Borrower and its Subsidiaries in one or more transactions of properties and assets comprising in the aggregate more than 20% of the fair market value of all assets of the Borrower and its Subsidiaries on a consolidated basis as determined at the start of such six month period.

"Maturity Date" means the earlier of (i) the Scheduled Maturity Date and (ii) the date the Loans are accelerated pursuant to Section 7.01.

"Maximum Rate" has the meaning specified in Section 9.14.

"Net Proceeds" means proceeds consisting of cash, checks or other Cash Equivalents as and when received in connection with a Material Disposition net of: (i) the direct costs and expenses relating to such Material Disposition excluding amounts costs and expenses payable to the Borrower or any Affiliate of the Borrower, (ii) sale, use or other transaction Taxes paid or payable as a result thereof, and (iii) amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Indebtedness secured by a Lien on any asset which is included within such Material Disposition.

"Net Worth" means for the Borrower, as of any date of determination, the total assets of the Borrower and its Subsidiaries as of such date of determination determined on a consolidated basis minus the total liabilities of the Borrower and its Subsidiaries as of such date

of determination determined on a consolidated basis. For purposes of calculating the total assets of the Borrower and its Subsidiaries: (i) Crypto Assets shall be valued as set forth in the definition thereof and (ii) the value of all assets held in trust shall be deemed to be $0.00.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the foregoing, the Obligations include (a) the obligation to pay principal, interest, charges, expenses, fees, indemnities and other amounts payable by the Borrower under any Loan Document and (b) the obligation of the Borrower to reimburse any amount in respect of any of the foregoing that any Lender in its sole discretion may elect to pay or advance on behalf of the Borrower.

"OFAC" has the meaning specified in Section 3.14(a).

"Organizational Documents" means (a) as to any corporation, the charter or certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) as to any limited liability company, the certificate or articles of formation or organization and operating or limited liability agreement and (c) as to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19(b)).

"Participant" has the meaning specified in Section 9.04(d).

"Participant Register" has the meaning specified in Section 9.04(d).

"<u>PATRIOT Act</u>" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"<u>Payment Date</u>" means the 1st Business Day of each calendar month (beginning July 1, 2022) and the Maturity Date.

"<u>Payment Recipient</u>" has the meaning specified in Section 8.11.

"<u>Permitted Liens</u>" means (a) Liens for Taxes that are not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained by the applicable Person; and (b) Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) that are customary in the banking industry.

"<u>Periodic Term SOFR Determination Day</u>" has the meaning specified in the definition of "Term SOFR".

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Personal Financial Statements</u>" means a financial report for the Borrower in the form of Exhibit E.

"<u>Pledge Agreement</u>" means the Pledge and Security Agreement, dated as of the Closing Date, among the Administrative Agent, the Borrower, each Designated LLC and the other pledgors party thereto.

"<u>Pledged Real Estate Entity</u>" means (i) each Person with respect to which any Equity Interests are pledged to the Administrative Agent on the Closing Date pursuant to the terms of the Pledge Agreement and (ii) each Person with respect to which the Equity Interests are pledged to the Administrative Agent after the Closing Date pursuant to the terms of the Pledge Agreement.

"<u>Prepayment Notice</u>" means a notice by the Borrower to prepay Loans, which shall be in such form as the Administrative Agent may reasonably approve, such approval not to be unreasonably withheld, conditioned or delayed.

"<u>Prime Rate</u>" means the rate of interest per annum last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent); <u>provided</u> that if the Prime Rate as so determined shall ever be less than the Floor, then the Prime Rate shall be deemed to be the Floor.  Any change in the Prime Rate shall take effect at the opening of business on the day such change is publicly announced or quoted as being effective.

"Prime Rate Loan" means a Loan that bears interest based on the Prime Rate.

"Proposed Cash Investment" means either of the following (i) a Proposed Investment to be made by the Borrower from Term Loan proceeds in the form of cash deposits in deposit accounts located at the domestic offices of any commercial bank organized under the laws of the United States of America or any State which has a combined capital and surplus and undivided profits of not less than $500,000,000, provided that the aggregate outstanding amount of all such Proposed Cash Investments made by the Borrower shall not exceed $10,000,000 at any time and (ii) a Proposed Investment to be made by a Designated LLC from Term Loan proceeds provided to it at the direction of the Borrower in the form of cash deposits in such deposit accounts; provided that in the case of clauses (i) and (ii) no such deposit shall be subject to any Lien of the applicable bank other than a customary Lien for fees and expenses in favor of the bank that holds such account.

"Proposed Investment" has the meaning specified in Section 2.03(b) and, for the avoidance of doubt, includes each Proposed Cash Investment.

"Proposed Investment Loan Amount" means, with respect to any Proposed Investment at any time, the amount of the Term Loan borrowed under this Agreement to finance the acquisition of such Proposed Investment minus the aggregate amounts previously deemed applied to the payment of such Proposed Investment Loan Amount pursuant to Section 2.06(g).

"Proposed Use of Proceeds" has the meaning specified in Section 2.03(b).

"Qualified Purchaser" means a "qualified purchaser" within the meaning of Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "1940 Act"), and the rules thereunder that meets the following conditions: (A) such Person was not formed, reformed, capitalized, recapitalized or operated  for the specific purpose of acquiring an Interest and was not formed for purposes of evading the 1940 Act; (B) such Person is not an entity formed before April 30, 1996 that would be an investment company under the 1940 Act but for the exception provided in either Section 3(c)(1) or Section 3(c)(7) of the 1940 Act; (C) the Interest to be acquired constitutes, at acquisition, less than 40% of the holder's total assets; (D) the shareholders, partners or other holders of equity or beneficial interests in the Person: (i) are not able to decide individually whether to participate, or the extent of their participation, in the Person's acquisition of the Interest; (ii) participate in all of the Person's investments or other assets such that profits and losses from the Interest to be acquired are shared by such holders in the same proportions as all other assets of the Person and may not be varied; and (iii) do not use the Person as a device for facilitating individual investment decisions of such holders; and (E) such Person is not (i) an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, that maintains an individual account for the benefit of each plan participant (a "DC Plan"), (ii) a trust maintained for the benefit of one or more DC Plans, or (iii) an investment fund, collective investment trust, insurance company separate account or other investment vehicle that accepts contributions from DC Plans, unless, in each case, each such plan participant is a Qualified Purchaser. Qualified Purchaser also means an entity each beneficial owner of which is itself a "qualified purchaser" within the meaning of the 1940 Act and meets all of the conditions set out above.

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK   Doc 1-1   Filed 07/18/25   Entered 07/18/25 12:43:34   Desc
Exhibit A   Page 25 of 135

"Recipient" means (a) the Administrative Agent or (b) any Lender, as applicable.

"Register" has the meaning specified in Section 9.04(c).

"Regulation T" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Released Claims" has the meaning specified in Section 7.03(b).

"Released Party" has the meaning specified in Section 7.03(b).

"Releasing Party" has the meaning specified in Section 7.03(b).

"Relevant Governmental Body" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"Removal Effective Date" has the meaning specified in Section 8.06(b).

"Required Lenders" means, at any time, Lenders having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Resignation Effective Date" has the meaning specified in Section 8.06(a).

"Sales Broker" has the meaning specified in Section 7.03(a).

"Sanctions" has the meaning specified in Section 3.14(a).

"Scheduled Maturity Date" means the fifth (5th) anniversary of the Closing Date (except that, if such date is not a Business Day, the Scheduled Maturity Date shall be the next preceding Business Day).

"Secured Party" means the Administrative Agent, each Lender, each Indemnitee and each other holder of any Obligation of a Credit Party.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR.

"Solvent" means, as to any Person as of any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in a business or a transaction for which such Person's property would constitute an unreasonably small capital.  The amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Collateral Indebtedness" means, as of any date of determination and any Specified Real Property Asset, the outstanding principal amount at such time of all Indebtedness of (x) the Specified Real Property Owner of such Specified Real Property Asset and (y) each other Person that is owned directly or indirectly by the Borrower and that is a direct or indirect owner of Equity Interests in such Specified Real Property Owner.  The Specified Collateral Indebtedness for each Specified Real Property Asset that is included in the Borrowing Base on the Closing Date shall be specified on the Borrowing Base Schedule attached as Schedule 1.01 to this Agreement and shall be modified from time to time in accordance with Section 5.14.  The Specified Collateral Indebtedness for each Specified Real Property Asset added to the Borrowing Base after the Closing Date initially shall be determined in accordance with Section 5.14(d) and shall be modified from time to time thereafter in accordance with Section 5.14.

"Specified Collateral Value" means, as of any date of determination and any Specified Real Property Asset, the value of such Specified Real Property Asset.  The value for each Specified Real Property Asset that is included in the Borrowing Base on the Closing Date shall be the value specified on the Borrowing Base Schedule attached as Scheule 1.01 to this Agreement and shall be modified from time to time in accordance with Section 5.14.  The value for each Specified Real Property Asset added to the Borrowing Base after the Closing Date initially shall be determined in accordance with Section 5.14(d) and shall be modified from time to time thereafter in accordance with Section 5.14(b).

"Specified Indebtedness" means, at any time, (i) all Specified Collateral Indebtedness outstanding at such time and (ii) all Indebtedness outstanding at such time (other than the Obligations) that either is secured by a Lien on any Proposed Investment with respect to which a Proposed Investment Loan Amount is outstanding or that is Indebtedness of any Person (other than the Borrower) that owns, either directly or indirectly, the properties or assets

- 20 -

constituting or underlying a Proposed Investment with respect to which a Proposed Investment Loan Amount is outstanding.

"Specified Pledged Equity Interest" means each Equity Interest representing a direct or indirect equity interest in a Specified Real Property Owner that is pledged, or required to be pledged, to the Administrative Agent by the Borrower or any Wholly-Owned Subsidiary of the Borrower in accordance with the terms of this Agreement.

"Specified Pledged Percentage" means, as of any date of determination and with respect to any Specified Real Property Asset, the aggregate beneficial equity ownership (expresed as a percentage) of the Borrower in the Specified Real Property Owner that is the owner of such Specified Real Property Asset that is being pledged to the Administrative Agent in accordance with the terms of this Agreement. The Specified Pledged Percentage for each Specified Real Property Asset that is included in the Borrowing Base on the Closing Date shall be specified on the Borrowing Base Schedule attached as Scheule 1.01 to this Agreement and shall be modified from time to time by the Lenders in accordance with Section 5.14. The Specified Pledged Percentage for each Specified Real Property Asset added to the Borrowing Base after the Closing Date initially shall be determined by the Lenders in accordance with Section 5.14(d) and shall be modified from time to time thereafter in accordance with Section 5.14(b).

"Specified Real Property Asset" means, at any time, each real property asset that is listed on the Borrowing Base Schedule in effect at such time.

"Specified Real Property Owner" means, at any time and with respect to any Specified Real Property Asset, the legal entity that owns such Specified Real Property Asset at such time.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, association or joint venture or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time owned or the management of which is controlled, directly, or indirectly through one or more intermediaries, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guaranty" means the Guaranty, dated as of the Closing Date, made by each Subsidiary Guarantor in favor of the Administrative Agent and guaranteeing the payment of the Obligations.

"Subsidiary Guarantor" means (i) Fox Capital LLC and each Designated LLC, (ii) each other Person that executes and delivers the Subsidiary Guaranty on the Closing Date and that is either (x) a direct Wholly-Owned Subsidiary of the Borrower that owns a Specified Real Property Asset or (y) a direct or indirect Wholly-Owned Subsidiary of the Borrower that directly or indirectly owns an Equity Interest in a Person that owns a Specified Real Property Asset and (iii) each Person of the type described in clause (ii) that becomes a party to the Subsidiary Guaranty after the Closing Date via a joinder agreement. Notwithstanding the foregoing, RH Dearborn Redevelopment JV LLC is not a Subsidiary Guarantor.

"Swap Contract" means any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" has the meaning specified in Section 2.01. On the date a Lender makes an advance constituting a Term Loan, such advance shall be deemed consolidated with each then outstanding Term Loan of such Lender so that at all times thereafter there shall be only one Term Loan for such Lender then outstanding

"Term Loan Exposure" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Term Loan.

"Term SOFR" means, for any Interest Period, the Term SOFR Reference Rate for a tenor comparable to such Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"Term SOFR Adjustment" means a percentage equal to 0.11448% per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent (acting at the written direction of the Required Lenders)).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Total Credit Exposure" means, as to any Lender at any time, the sum of the unused Commitments of such Lender and Term Loan Exposure of such Lender at such time.

"Total Debt" means for the Borrower, as of any date of determination, the aggregate principal amount of all Indebtedness of the Borrower and its Subsidiaries on such date determined on a consolidated basis.

"Total Debt to Asset Ratio"  means for the Borrower, as of any date of determination, a ratio (expressed as a percentage) the numerator of which is (i) the Total Debt on such date and (ii) the denominator of which is the fair market value of all assets of the Borrower and its Subsidiaries on such date determined on a consolidated basis.  For purposes of calculating the fair market value of all assets of the Borrower and its Subsidiaries: (i) Crypto Assets shall be valued as set forth in the definition thereof and (ii) the value of all assets held in trust shall be deemed to be $0.00.

"Trade Date" has the meaning specified in Section 9.04(b)(i).

"Transfer" has the meaning specified in Section 9.04(f).

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Prime Rate.

"UCC" means the Uniform Commercial Code as in effect in the State of New York or any other applicable jurisdiction.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Undrawn Commitment Fee" has the meaning specified in Section 2.10(a).

"United States" and "U.S." mean the United States of America.

"Unpaid Minimum Return Amount" means, as of any date of determination, the result, if a positive number, of (x) 15% of the aggregate Commitments (as in effect on the Closing Date or, if the Commitments have been increased prior to such determination date in accordance with Section 2.07(a), on the date of such increase) minus (y) the sum of the following: (i) the aggregate amount of interest (excluding default interest) paid by the Borrower to the Lenders on or prior to such determination date, (ii) the aggregate amount of Undrawn Commitment Fees paid by the Borrower to the Lenders on or prior to such determination date, plus (iii) the aggregate amount of the Upfront Fees paid to the Lenders on the Closing Date plus (iv) if the Commitments have been increased prior to such determination date in accordance with Section 2.07(a), the aggregate amount of the fee paid to the Lenders pursuant to Section 2.07(a) on the date such increase became effective.

- 23 -

"Upfront Fee" means a fee payable to each Lender on the Closing Date equal to 1% of such Lender's Commitment on the Closing Date.

"U.S. Borrower" means any Borrower that is a U.S. Person.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 2.16(g).

"Wholly-Owned" means, as to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which are owned by such Person and/or by one or more Wholly-Owned Subsidiaries of such Person.

"Withholding Agent" means the Borrower and the Administrative Agent.

SECTION 1.02    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  The word "or" is not exclusive. The word "year" shall refer (i) in the case of a leap year, to a year of three hundred sixty-six (366) days, and (ii) otherwise, to a year of three hundred sixty-five (365) days.  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03    Accounting Terms; Changes in GAAP.  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall be construed in conformity with GAAP.  Except for financial statements of the Borrower or a Person that owns only real estate (which in each case shall be prepared on a cash basis), all financial statements required to be delivered to the Administrative Agent and the Borrower pursuant to this Agreement shall be prepared in accordance with GAAP as in effect at the time of such preparation.

SECTION 1.04    Rates.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Prime Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition

- 24 -

thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Prime Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Prime Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE II

## COMMITMENTS AND TERM LOANS

SECTION 2.01    Commitments.    Subject to the terms and conditions set forth herein, each Lender severally agrees to make loans (each such loan, a "Term Loan") to the Borrower from time to time on any Business Day during the Availability Period in an aggregate principal amount that will not result in (a) such Lender's Term Loan Exposure exceeding such Lender's Commitment and (b) the total Term Loan Exposures for all Lenders exceeding the total Commitments for all Lenders.    During the Availability Period, within the foregoing limits and subject to the terms and conditions set forth in this Agreement, the Borrower may borrow, prepay and repay, and reborrow Term Loans. After the end of the Availability Period, subject to the terms and conditions set forth in this Agreement, the Borrower may prepay and repay Term Loans but Term Loans once repaid or prepaid may not be reborrowed.

SECTION 2.02    Loans and Borrowings.

(a)    Borrowings.    Each Term Loan shall be made as part of a Borrowing consisting of Term Loans made by the Lenders ratably in accordance with their respective Commitments.

(b)    Type of Loans.    Subject to Section 2.20, each Borrowing shall be comprised entirely of SOFR Loans.

(c)    Minimum Amounts.    Each Borrowing shall be in an aggregate amount of $1,000,000 or a larger multiple of $100,000 in excess thereof.

SECTION 2.03    Borrowing Requests.

(a)    Notice by Borrower.    Each Borrowing shall be made upon the Borrower's delivery to the Administrative Agent and the Lenders of a Borrowing Request, appropriately completed and signed by the Borrower, and must be received by the Administrative Agent not

- 25 -

later than 11:00 a.m. (New York City time) at least five (5) Business Days prior to the date of the requested Borrowing.

(b)        Content of Borrowing Requests.  Each Borrowing Request shall include or attach the following information: (i) the aggregate amount of the requested Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the location and number of the Borrower's account to which funds are to be disbursed; (iv) a statement describing in detail, satisfactory to the Lenders in their reasonable discretion, the investment and /or assets (the "Proposed Investment") to which the proceeds of such Borrowing will be applied by the Borrower (including a statement as to whether such investment is a Proposed Cash Investment) (the foregoing, the "Proposed Use of Proceeds"); (v) the information referred to in clauses (e) through (i) of Section 4.02; and (vi) such certifications as are specified in the Borrowing Request form.  The detail to be supplied pursuant to clause (iv) shall include, where applicable to the Proposed Investment, (A) a description of the Proposed Investment, (B) the purchase price of such Proposed Investment, (C) for a Proposed Investment that is a financial asset (other than a Proposed Cash Investment), the financial terms of such  Proposed Investment such as principal amount, interest rate, amortization schedule, equity price, number of equity units, percentage of outstanding equity, and financial statements of the applicable issuer, (D) for physical assets, an appraisal, a valuation, location information, identifying serial numbers, and make or model information, (E) for a Proposed Cash Investment, the identity of the relevant commercial bank, the applicable account number(s) at such bank, the amount of such Proposed Cash Investment, the aggregate outstanding amount of all Proposed Cash Investments after giving effect to such Proposed Cash Investment, and whether such Proposed Cash Investment is being made by the Borrower directly or by a Designated LLC, and (F) any other information that a reasonable investor would view as material in determining whether to acquire such Proposed Investment.

(c)        Notice by Administrative Agent to Lenders.  Promptly following receipt of a Borrowing Request, the Administrative Agent shall advise each Lender of the details thereof including the Proposed Use of Proceeds specified therein.  No later than two (2) Business Days after it receives a Borrowing Request, each Lender will notify the Administrative Agent and the Borrower whether it approves the Proposed Use of Proceeds.  If each Lender approves the Proposed Use of Proceeds, the amount of the Borrowing will be the amount specified in the Borrowing Request, and the Administrative Agent will notify each Lender of the amount of such Lender's Loan to be made as part of the requested Borrowing.  If one or more Lenders do not approve the Proposed Use of Proceeds (or fail to respond within the time specified above), the Borrower may by notice to the Administrative Agent delivered no later than one (1) (Business Day) after the Lenders have notified the Borrower of such non-approval (or the Lenders have failed to respond), cancel such Borrowing Request.  If the Borrower elects not to cancel the Borrowing Request, (i) the Borrower will provide to the Administrative Agent and the Lenders evidence reasonably satisfactory to them that it will contribute 20% of the aggregate purchase price of the Proposed Investment, (ii) the Borrowing will be 80% of the aggregate purchase price amount of the Proposed Investment, and (iii) the Administrative Agent will notify each Lender of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04    Funding of Borrowings.

- 26 -

(a)    Funding by Lenders.    Each Lender shall make the amount of each Borrowing to be made by it hereunder available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 12:00 noon (New York City time) on the proposed date for such Borrowing.  The Administrative Agent will make all such funds so received available to the Borrower in like funds, by wire transfer of such funds in accordance with the instructions provided in the applicable Borrowing Request and on the same Business Day of receipt of the same from the Lenders.

(b)    Presumption by Administrative Agent.    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.04(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by the Borrower, the interest rate specified in Section 2.09(a).  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.05    [Intentionally Omitted].

SECTION 2.06    Prepayments.

(a)    Optional Prepayments.    The Borrower may, upon notice to the Administrative Agent, at any time and from time to time prepay any Borrowing in whole or in part, subject to the requirements of this Section. Each partial prepayment of any Borrowing under this Section 2.06(a) shall be in an amount equal to $1,000,000 or greater in multiples of $100,000 in excess thereof. Each such notice pursuant to this Section 2.06(a) shall be in the form of a written Prepayment Notice, appropriately completed and signed by the Borrower, and must be received by the Administrative Agent not later than 11:00 a.m. (New York City time) three Business Days before the date of prepayment. Each Prepayment Notice shall specify the prepayment date and the principal amount of the Term Loans to be prepaid.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the applicable Lenders of the contents thereof.  Each such Prepayment Notice shall be irrevocable

(b)    Mandatory Prepayments – Borrowing Base Deficiency.    The Borrower shall, at the time and to the extent required under Section 5.14(f), either prepay the outstanding

- 27 -

principal amount of the Term Loans or deposit such amount into the Bank Asset Account, in each case, in an amount at least equal to the then existing Borrowing Base Deficiency.

(c)    Mandatory Prepayments – Disposal of Proposed Investment. The Borrower shall, within three (3) Business Days after the Borrower Disposes of any Proposed Investment with respect to which any Proposed Investment Loan Amount is outstanding, either prepay the outstanding principal amount of the Term Loans or deposit such amount into the Bank Asset Account, in either case, in an amount at least equal to the Proposed Investment Loan Amount for such Proposed Investment.

(d)    Mandatory Prepayments – Material Disposition.  The Borrower shall, within three (3) Business Days after the occurrence of any Material Disposition prepay the outstanding principal amount  of the Term Loans in an amount equal to the Net Proceeds of such Material Disposition; provided that if the Borrower notifies the Administrative Agent and the Lenders at such time in writing that the Borrower or any of the Subsidiaries intend to re-invest the Net Proceeds of such Material Disposition (or a portion thereof) within six months after receipt of such Net Proceeds in other properties or assets, then no prepayment of the Net Proceeds proposed to be re-invested shall be required except to the extent of any such Net Proceeds that have not been so re-invested by the end of such 6-month period, at which time a prepayment shall be required in an amount equal to such Net Proceeds.  At the time the Borrower provides such a notice of its intent to re-invest Net Proceeds, it shall deposit the Net Proceeds that are proposed to be re-invested into the Bank Asset Account where such Net Proceeds shall remain on deposit until such time as the Borrower notifies the Administrative Agent in writing that such Net Proceeds are to be used to fund the acquisition costs of such re-investment (which notice shall specify (i) the amount of the Net Proceeds to be re-invested, (ii) the nature of the properties or assets to be acquired with such proceeds, and (iii) the account of the Borrower to which such Net Proceeds are to be transferred).  Upon receipt of such notice, the Administrative Agent shall direct Depository to transfer the requested funds from the Bank Asset Account to an account specified by the Borrower in such notice.

(e)    Mandatory Prepayments - CBRM Realty or Crown Capital. The Borrower shall prepay the outstanding principal amount of the Term Loans in full within one (1) Business Day after (i) the date on which Borrower Disposes of, or permits the Disposition of, more than 50% of the CBRM Realty Equity or Crown Capital Equity directly or indirectly owned by it as of the Closing Date or (ii) the first date after the Closing Date on which the Borrower no longer Controls CBRM Realty or Crown Capital. In addition, the Commitments automatically shall terminate upon the occurrence of such event.

(f)    Mandatory Prepayment – Incurrence of Indebtedness Secured by a Proposed Investment. The Borrower shall, within three (3) Business Days after the Borrower incurs any Indebtedness permitted under Section 6.01 that is secured by a Lien on any Proposed Investment, either prepay the outstanding principal amount of the Term Loans or deposit such amount into the Bank Asset Account in either case in an amount at least equal to the lesser of (i) the Proposed Investment Loan Amount for such Proposed Investment or (ii) the aggregate principal amount of the Indebtedness incurred.

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 35 of 135

(g)     <u>Mandatory Prepayments – Disposal or Removal of Assets from Borrowing Base</u>.  Unless each Lender waives in writing the requirement to make such payment, the Borrower shall, at the time and to the extent required under Section 5.14(c) or (e), either prepay the outstanding principal amount of the Term Loans or deposit such amount into the Bank Asset Account, in each case, in an amount equal to the amount specified in Section 5.14(c) or (e), as applicable.

(h)     <u>Mandatory Prepayment – Incurrence of Additional Indebtedness by a Specified Real Property Owner</u>.  Unless each Lender waives in writing the requirement to make such payment, the Borrower shall, within three (3) Business Days after the Borrower incurs any Indebtedness permitted by the third paragraph of Section 6.01, either prepay the outstanding principal amount of the Term Loans or deposit such amount into the Bank Asset Account in either case in an amount at least equal to the amount specified in the third paragraph of Section 6.01.

(i)     <u>Notices</u>.  At the time of each prepayment pursuant to Section 2.06 (other than Section 2.06(e), the Borrower shall notify the Administrative Agent as to the amount of such prepayment that shall be deemed applied to each then outstanding Proposed Investment Loan Amount.  If the Borrower fails to provide such notice, such prepayment shall be deemed applied to the Proposed Investment Loan Amounts starting with the largest and ending with the smallest.

(j)     <u>Application</u>.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.12.

(k)     <u>Payment of Unpaid Minimum Return Amount</u>. If as a result of any payment, repayment or prepayment made under this Agreement (whether pursuant to this Section 2.06, Section 2.08, Section 7.01, or Section 7.02 or otherwise) and any termination of the Commitments under Section 2.07 whereby the Loans are paid in full and no further Loans may be borrowed hereunder, then Borrower shall pay to the Lender the Unpaid Minimum Return Amount, if any, at such time.

SECTION 2.07     <u>Commitments; Increase and Termination</u>.

(a)     <u>Optional Commitment Increase</u>.  On one occasion during the Availability Period, the Borrower may request, in a writing delivered to the Administrative Agent and Lenders, a $10,000,000 increase in the Commitments from $20,000,000 to $30,000,000.  Any such increase to the Commitments will be effective only during the Availability Period and will be made at the sole and absolute discretion of the Lenders subject to, among other things, (i) payment by the Borrower of a fee equal to 1.00% of the Commitment increase on the date such increase becomes effective, (ii) there not existing at the time of such request or on the date such increase would become effective any Default or Event of Default, (iii) receipt from the Lenders of additional aggregate commitments equal to the amount of increase, and (iv) the execution and delivery by the Loan Parties of amendments to the Loan Documents satisfactory to the Lenders implementing such increases. The Administrative Agent (on behalf of the Lenders) shall respond to any such request by providing a written response to the Borrower not less than five (5) Business Days after receipt of such request. At the time such increase to the Commitments becomes effective the Borrowing Base Minimum Amount shall increase to $15,000,000 as provided in the definition thereof.

(b)     Optional Commitment Termination.  The Borrower may, upon notice to the Administrative Agent, terminate the entire unused portion of the Commitments; provided that (a) each such notice shall be in writing and must be received by the Administrative Agent at least five (5) Business Days prior to the effective date of such termination, and shall be irrevocable and (b) the Borrower shall not terminate the Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the total Term Loan Exposures would exceed the total Commitments. Unless previously terminated, the Commitments shall automatically terminate on the Commitment Termination Date.

(c)     Application of Commitment Termination.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Commitments pursuant to this Section.  Upon any termination of unused Commitments, the Commitment of each Lender shall be reduced by such Lender's ratable share of the amount of such reduction.

SECTION 2.08    Repayment of Loans.  The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Maturity Date the aggregate principal amount of all Term Loans outstanding on such date.

SECTION 2.09    Interest.

(a)     Interest Rates.  Subject to paragraph (b) of this Section, (i) each SOFR Loan shall bear interest at a rate per annum equal to Adjusted Term SOFR for the Interest Period in effect plus the Applicable Margin and (ii) each Prime Rate Loan shall bear interest at a rate per annum equal to the Prime Rate in effect for any day plus the Applicable Margin.

(b)     Default Interest.  If any amount payable by the Borrower under this Agreement or any other Loan Document (including principal of any Loan, interest, fees and other amount) is not paid when due, whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a rate per annum equal to the applicable Default Rate.  Upon the request of the Required Lenders, while any Event of Default exists, the Borrower shall pay interest on the principal amount of all Loans outstanding hereunder at a rate per annum equal to the applicable Default Rate.

(c)     Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Payment Date and at such other times as may be specified herein; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand, (ii) in the event of any payment, repayment or prepayment of any Loan, accrued interest on the principal amount paid, repaid or prepaid shall be payable on the date of such payment, repayment or prepayment and (iii) in the event of any conversion of any SOFR Loan prior to the end of the Interest Period therefor, accrued interest on such SOFR Loan shall be payable on the effective date of such conversion.

(d)     Interest Computation.  All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

KL2 3279308.20

The Prime Rate or Adjusted Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(e)      Term SOFR Conforming Changes.   In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

SECTION 2.10      Fees.

(a)      Undrawn Commitment Fees.   The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee (the "Undrawn Commitment Fee") on the average daily unused amount of the Commitment of such Lender, which shall accrue at a rate per annum equal to 3.00% during the period from and including the Closing Date to but excluding the Commitment Termination Date.  Undrawn Commitment Fees that have accrued through the last day of any calendar month shall be payable in arrears on the Payment Date following the end of such month and on the Commitment Termination Date.  For purposes of computing Undrawn Commitment Fees, (i) the Commitment of any Lender shall be deemed to be used on any date to the extent of the aggregate principal amount of all Term Loans of such Lender outstanding on such date and (ii) the Commitment of any Lender at any time shall include any increase in the Commitments that occurred pursuant to Section 2.07(a) prior to the date of such computation but only for so long as such increase was in effect.

(b)      Upfront Fee.   The Borrower agrees to pay to each Lender on the Closing Date for its own account the Upfront Fee (net of the Earnest Money Deposit).

(c)      Administrative Agent Fees.   The Borrower agrees to pay to the Administrative Agent for its own account the fees payable in the amounts and at the times agreed pursuant to the Administrative Agent Fee Letter.

(d)      Fee Computation.  All fees payable under Section 2.10(a) shall be computed on the basis of a year of 360 days.  Each determination by the Administrative Agent of a fee hereunder shall be conclusive absent manifest error.

SECTION 2.11      Evidence of Debt.

(a)      Maintenance of Records.   Each Lender shall maintain in accordance with its usual practice records evidencing the indebtedness of the Borrower to such Lender resulting from each Term Loan made by such Lender.  The Administrative Agent shall maintain the Register in accordance with Section 9.04(c).  The entries made in the records maintained pursuant to this paragraph (a) shall be prima facie evidence absent manifest error of the existence and amounts of the obligations recorded therein.  Any failure of any Lender or the Administrative Agent to maintain such records or make any entry therein or any error therein shall not in any manner affect the obligations of the Borrower under this Agreement and the other Loan Documents.  In the event

- 31 -

of any conflict between the records maintained by any Lender and the records maintained by the Administrative Agent in such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(b)     Promissory Notes.   Upon the request of any Lender made through the Administrative Agent, the Borrower shall prepare, execute and deliver to such Lender a promissory note of the Borrower payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form approved by the Administrative Agent, which shall evidence such Lender's Loans in addition to such records.

SECTION 2.12     Payments Generally; Several Obligations of Lenders.

(a)     Payments by Borrower.   All payments to be made by the Borrower hereunder and the other Loan Documents shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.   Except as otherwise expressly provided herein, all such payments shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in immediately available funds not later than 2:00 PM (New York City time) on the date specified herein.   All amounts received by the Administrative Agent after such time on any date shall be deemed to have been received on the next succeeding Business Day and any applicable interest or fees shall continue to accrue.   The Administrative Agent will promptly distribute to each Lender its ratable share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's applicable lending office (or otherwise distribute such payment in like funds as received to the Person or Persons entitled thereto as provided herein).   If any payment to be made by the Borrower shall fall due on a day that is not a Business Day, payment shall be made on the next succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be; provided that, if such next succeeding Business Day would fall after the Scheduled Maturity Date, payment shall be made on the immediately preceding Business Day.   Except as otherwise expressly provided herein, all payments hereunder or under any other Loan Document shall be made in Dollars.

(b)     Application of Insufficient Payments.   Subject to Section 7.02, if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, fees and other amounts then due hereunder, such funds shall be applied (i) first, to pay interest, fees and other amounts then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, fees and other amounts then due to such parties, and (ii) second, to pay principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     Presumptions by Administrative Agent.   Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.   In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such

KL2 3279308.20

amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(d)    Deductions by Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Sections 2.04(b), 2.13 or 9.03(c), then the Administrative Agent (acting at the written direction of the Required Lenders (calculated without taking into account the Total Credit Exposure of such Lender)) may (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to the Administrative Agent until all such unsatisfied obligations are fully paid or (ii) hold any such amounts in a segregated account as cash collateral for, and for application to, any future funding obligations of such Lender.

(e)    Several Obligations of Lenders.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 9.03(c) are several and not joint.  The failure of any Lender to make any Loan or, as applicable, to fund any such participation or to make any such payment on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its applicable Loan, to purchase its participations, as applicable, or to make its payment under Section 9.03(c).

SECTION 2.13    Sharing of Payments.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Term Loans and accrued interest thereon or other such obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Term Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements

may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

SECTION 2.14     Compensation for Losses.  In the event of the failure to borrow or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto, then the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event, including any loss, cost or expense arising from the liquidation or redeployment of funds or from any fees payable.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within  thirty (30) days after receipt thereof.

SECTION 2.15     Increased Costs.

(a)      Increased Costs Generally.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)      subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation in any such Loan;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender, or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)      Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the

KL2 3279308.20

policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than three (3) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the three-month period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 2.16    Taxes.

(a)    Defined Terms.  For purposes of this Section, the term "Applicable Law" includes FATCA.

(b)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by Borrower.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, Law, or at the option of the Administrative Agent, timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by Borrower.  The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether

- 35 -

or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within thirty (30) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (g)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

- 36 -

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 43 of 135

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio

- 37 -

interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties,

interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Form W-9.  The Administrative Agent shall provide the Borrower with an IRS Form W-9 and agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower of the same.

(j)     Survival.  Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.17     Inability to Determine Rates.  Subject to Section 2.20, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(a)     the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or

(b)     the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent,

 the Administrative Agent will promptly so notify the Borrower and each Lender.  Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to clause (b), at the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Prime Rate Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into Prime Rate Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted.

SECTION 2.18    Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or to determine or charge interest based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent) (an "Illegality Notice"), any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans, shall be suspended until each affected Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of an Illegality Notice, the Borrower shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans to Prime Rate Loans on the last day of the Interest Period therefor, if all affected Lenders may lawfully continue to maintain such SOFR Loans to such day, or immediately, if any Lender may not lawfully continue to maintain such SOFR Loans to such day, in each case until the Administrative Agent is advised in writing by each affected Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

SECTION 2.19    Mitigation Obligations; Replacement of Lenders.

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 2.15, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.16, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.16, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.16 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with paragraph (a) of this Section, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.04), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.15 or Section 2.16) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

- 40 -

(i)      the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 9.04;

(ii)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 2.14) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)      in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.16, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)      such assignment does not conflict with Applicable Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Notwithstanding anything in this Section to the contrary, the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 8.06.

SECTION 2.20    Benchmark Replacement Setting.

(a)      Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(b)      Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative

- 41 -

Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)     _Notices; Standards for Decisions and Determinations_.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.   The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.20(d) and (y) the commencement of any Benchmark Unavailability Period.   Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.20, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.20.

(d)     _Unavailability of Tenor of Benchmark_.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     _Benchmark Unavailability Period_.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Prime Rate Loans.

SECTION 2.21     _Defaulting Lenders_.

(a)    <u>Defaulting Lender Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)    <u>Waivers and Amendments</u>.    Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and Section 9.02(b).

(ii)    <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, [intentionally omitted]; *third*, [intentionally omitted]; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *sixth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments without giving effect to clause (iv) below.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    <u>Undrawn Commitment Fees</u>.    No Defaulting Lender shall be entitled to receive any Undrawn Commitment Fee for any period during which that

- 43 -

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 50 of 135

Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    <u>Defaulting Lender Cure</u>.  If the Borrower and the Administrative agree that a Lender no longer meets the requirements for classification as a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments, whereupon, such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III

## <u>REPRESENTATIONS AND WARRANTIES</u>

The Borrower represents and warrants to the Administrative Agent and the Lenders for itself and for each Loan Party as of the Closing Date, as of each date that a Borrowing Request is delivered, and as of each date that a Term Loan is made that:

SECTION 3.01    <u>Existence, Qualification and Power; Domicile and Primary Residence</u>.

(a)    Each Loan Party that is not a natural person (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, except, in each case referred to in clause (a) (other than with respect to the Borrower) or (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)    The domicile and the primary residence of the Borrower is correctly set forth on Schedule 3.01 hereto.  If the Borrower (a) possesses an unexpired driver's license the Borrower's full legal name on his or her most recently issued unexpired driver's license is as set forth on the signature page to this Agreement or (b) does not possess an unexpired driver's license, such Borrower's full legal name is as set forth on the signature page this Agreement.

SECTION 3.02    <u>Authorization; No Contravention</u>.  The execution, delivery and performance by each Loan Party that is not a natural person of each Loan Document to which it is party have been duly authorized by all necessary corporate or other organizational action, and do

- 44 -

not and will not contravene the terms of its Organizational Documents.  The execution, delivery and performance by each Loan Party of each Loan Document to which it is party do not (a) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which such Loan Party is a party or affecting the Borrower, such Loan Party or the properties of the Borrower or such Loan Party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject or (b) violate any Law in any material respect.

SECTION 3.03    Governmental Authorization; Other Consents.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of any Loan Document to which it is a party, except for such approvals, consents, exemptions, authorizations, actions or notices that have been duly obtained, taken or made and are in full force and effect, copies of which (if material) have been provided to the Administrative Agent and the Lenders.

SECTION 3.04    Execution and Delivery; Binding Effect.  Each Loan Document, has been duly executed and delivered by each Loan Party.  Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party thereto, enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally and by general principles of equity.

SECTION 3.05    Financial Statements; No Material Adverse Effect.

(a)    Personal Financial Statements.  The Personal Financial Statements most recently delivered to the Administrative Agent and the Lenders under this Agreement are true, correct and complete and fairly present in all material respects the financial condition of the Borrower as of the date thereof.

(b)    No Material Adverse Effect.  Since the date of the most recent Personal Financial Statements delivered to the Administrative Agent and the Lenders on or prior to the Closing Date, there has been no event or circumstance that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

SECTION 3.06    Litigation.  There are no actions, suits, proceedings, claims, disputes or investigations pending or, to the knowledge of the Borrower, threatened, at Law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or against any of their properties or revenues that (a) except as specifically disclosed in Schedule 3.06, either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect or (b) purport to affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby.

SECTION 3.07    No Default.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.  No default or event of default has occurred and is continuing or would result

Case 25-01295-MBK Doc 1-1 Filed 07/18/25 Entered 07/18/25 12:43:34 Desc
Exhibit A Page 52 of 135

from the consummation of the transactions contemplated by this Agreement or any other Loan Document, in each case, under the documents governing any Specified Indebtedness.

SECTION 3.08    Property. Each Loan Party has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title that, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.09    Taxes.  The Borrower has filed all federal, state and other tax returns and reports required to be filed, and have paid all federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (a) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.10    Disclosure.  The reports, financial statements, certificates and other written information (other than projected or pro forma financial information) furnished by or on behalf of the Borrower to any Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder or under any other Loan Document, taken as a whole, do not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not misleading. The information included in the Borrowing Base Schedule is true and correct.

SECTION 3.11    Compliance with Laws.  Each Loan Party is in compliance with the requirements of all Applicable Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances where the failure to so comply, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.12    Environmental Matters.  Except with respect to any matters that, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, no Loan Party (a) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (b) knows of any basis for any permit, license or other approval required under any Environmental Law to be revoked, canceled, limited, terminated, modified, appealed or otherwise challenged, (c) has or could reasonably be expected to become subject to any Environmental Liability, (d) has received notice of any claim, complaint, proceeding, investigation or inquiry with respect to any Environmental Liability (and no such claim, complaint, proceeding, investigation or inquiry is pending or, to the knowledge of the Borrower, is threatened or contemplated) or (e) knows of any facts, events or circumstances that could give rise to any basis for any Environmental Liability of the any Loan Party.

SECTION 3.13    Margin Regulations.  No part of the proceeds of any Term Loan hereunder will be used to buy or carry any Margin Stock in violation of Regulations T, U and X. Following the application of the proceeds of each Borrowing, not more than 25% of the value of the Borrower's assets will be Margin Stock.

- 46 -

SECTION 3.14    Sanctions; Anti-Corruption.

(a)    None of the Borrower, or, to the knowledge of the Borrower, any other Loan Party or any director or officer thereof is an individual or entity ("person") that is, or is owned or controlled by persons that are: (i) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State (collectively, "Sanctions"), or (ii) located, organized or resident in a country or territory that is the subject of Sanctions (including Crimea, Cuba, Iran, North Korea, Donetsk Republic and Luhansk People's Republic of Ukraine, Russia and Syria).

(b)    The Borrower and, to the knowledge of the Borrower, each Loan Party and their respective directors, officers, employees and agents, are in compliance with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA") and any other applicable anti-corruption law, in all material respects.  The Borrower has instituted and maintain policies and procedures reasonably designed to promote and achieve continued compliance with applicable Sanctions, the FCPA and any other applicable anti-corruption laws when made or delivered.

SECTION 3.15    Collateral Documents; Collateral.

(a)    Subject to Section 5,15, the Collateral Documents create valid and enforceable Liens on the Collateral purported to be covered thereby, and such Liens are perfected Liens in favor of the Administrative Agent, for the benefit of the Secured Parties, prior to all other Liens other than Permitted Liens.

(b)    The Borrower is the legal, record and beneficial owner of, and has good title to, the Collateral being or purported to be pledged by it.  No part of the Collateral is subject to any Lien or any adverse claim of any kind whatsoever (including, without limitation, any defense, counterclaim, setoff, right of recoupment, abatement, or community property right), except those created by the Loan Documents.

(c)    No UCC-1 financing statement or fixture filing naming the Borrower as debtor is on file in any jurisdiction.

SECTION 3.16    Organizational Structure.  Set forth as Schedule 3.16 is a true and complete organizational chart of the Borrower and all of its Subsidiaries and Affiliates, which the Borrower shall update in accordance with Section 5.01(b).

SECTION 3.17    Solvency.  The Borrower is Solvent.

ARTICLE IV

CONDITIONS

SECTION 4.01    Closing Date.  The obligation of each Lender to make Term Loans hereunder is subject to the satisfaction (or waiver in accordance with Section 9.02) of the

- 47 -

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK   Doc 1-1   Filed 07/18/25   Entered 07/18/25 12:43:34   Desc
Exhibit A    Page 54 of 135

following conditions (and, in the case of each document specified in this Section to be received by the Administrative Agent, such document shall be in form and substance satisfactory to the Administrative Agent and each Lender):

(a)    <u>Executed Counterparts</u>. The Administrative Agent shall have received from each party thereto a counterpart of each Loan Document signed on behalf of such party.

(b)    <u>Security Interests</u>. The Administrative Agent shall have valid and perfected security interests in the Collateral subject only to Permitted Liens. All financing statements (other than with respect to the Borrower) or comparable documents that the Loan Documents require to be filed to perfect the Liens in the Collateral created by the Collateral Documents shall have been filed. All certificates representing Equity Interests that constitute Collateral, accompanied by instruments of transfer and stock powers endorsed in blank, shall have been delivered to the Administrative Agent.

(c)    <u>UCC and Other Searches</u>. The Administrative Agent and the Lenders shall have received (i) the results of a recent lien, bankruptcy and judgment search in each relevant jurisdiction with respect to the Loan Parties (other than each Designated LLC) and such search shall reveal no Liens on any of the Collateral except for Permitted Liens and (ii) a copy of each driver's license held by the Borrower as of the Closing Date.

(d)    <u>Certificates</u>. The Administrative Agent and the Lenders shall have received such customary certificates of resolutions or other action, incumbency certificates and/or other certificates of the Loan Parties as the Lenders may require.

(e)    <u>Corporate Documents</u>. The Administrative Agent and the Lenders shall have received such other documents and certificates (including Organizational Documents and good standing certificates) as the Lenders may request relating to the organization, existence and good standing of the Loan Parties that are not natural persons and any other legal matters relating to the Loan Parties, the Loan Documents or the transactions contemplated thereby. With respect to each of Fox Capital LLC, RH Dearborn Redevelopment JV LLC, and each Designated LLC, the limited liability company agreement of the applicable entity shall provide, or shall have been amended to provide, that each Equity Interest of such entity is certificated and is a "security" within the meaning of Article 8 of the New York UCC.

(f)    <u>Governmental and Third Party Consents</u>. All approvals, consents, exemptions, authorizations, or other actions by, or notices to, or filings with, any Governmental Authority or any other Person necessary or required in connection with the execution, delivery or performance by, or enforcement by or against any Loan Party of any Loan Document have been duly obtained, taken or made and are in full force and effect, copies of which (if material) have been delivered to the Administrative Agent and each Lender, including, without limitation, the following:

(i)    the Freedom Park Consent pursuant to which XCAL 2021-GA-5 Mortgage Trust, as successor-in-interest to X-Caliber Funding LLC, as lender to Freedom Park Apartments LLC, consents to the pledge by the Borrower of the Equity Interests of Fox Capital LLC; and

KL2 3279308.20

(ii)      the Dearborn Consent pursuant to which Fund Investment 147, LLC, as lender to RH Dearborn Redevelopment LLC, consents to the pledge by the Borrower of the Equity Interests of  RH Dearborn Redevelopment JV LLC.

(g)      Opinion of Counsel to Borrower.   The Administrative Agent and the Lenders shall have received opinions of Mayer Brown LLP, counsel to the Borrower, addressed to the Administrative Agent and the Lenders and dated the Closing Date, in form and substance satisfactory to the Lenders (and the Borrower hereby instructs such counsel to deliver such opinion to such Persons).

(h)      Fees and Expenses.   The Borrower shall have paid all fees, costs and expenses (including legal fees and expenses) of each of the Administrative Agent and the Lenders in connection herewith (including pursuant to the Administrative Agent Fee Letter) to the extent due (and, in the case of expenses (including legal fees and expenses), to the extent that statements for such expenses shall have been delivered to the Borrower on or prior to the Closing Date).

(i)      KYC Information.   The Administrative Agent and Lenders have received all internal approvals regarding compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act.

(j)      Financial Statements.    The Borrower shall have delivered to the Administrative Agent and the Lenders Personal Financial Statements for the quarter ending March 31, 2022.

(k)      Litigation.      There shall be no action, suit, proceeding (whether administrative, judicial or otherwise) or arbitration at law or in equity, or any action, suit, proceeding, governmental investigation or arbitration pending or, to the knowledge of the Borrower, threatened against any Loan Party or affecting any property of any Loan Party, that relate to the Loan Documents.

(l)      Officer's Certificate.   The Administrative Agent and the Lenders shall have received a certificate, dated the Closing Date and signed by the Borrower, confirming satisfaction of the conditions set forth in this Section and compliance with the conditions set forth in this Section 4.01.

(m)      Representations and Warranties.   The representations and warranties of the Loan Parties set forth in this Agreement and in any other Loan Document shall be true and correct in all material respects (or, in the case of any such representation or warranty already qualified by materiality, in all respects) on and as of the Closing Date (or, in the case of any such representation or warranty expressly stated to have been made as of a specific date, as of such specific date);

(n)      No Default.   On the Closing Date, no Default or Event of Default shall have occurred and be continuing or would result from the occurrence of the Closing;

(o)      Bank Asset Account.   The Bank Asset Account shall have been opened and the Deposit Account Control Agreement shall have been executed and delivered by each party thereto and shall be in full force and effect.

(p)      Other Documents.  The Administrative Agent and the Lenders shall have received such other certificates and documents as the Administrative Agent or the Lenders may reasonably request.

(q)      Due Diligence.  The Lenders shall have received all financial and other due diligence materials regarding the Borrower, the other Loan Parties, and the Collateral requested by them and shall have completed their due diligence (including site visits and management meetings) to their satisfaction.

Without limiting the generality of Section 8.03(c), for purposes of determining satisfaction of the conditions specified in this Section, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

SECTION 4.02      Conditions to the Making of Each Term Loan.  The obligation of each Lender to make a Term Loan (including its initial Term Loan) is additionally subject to the satisfaction of the following conditions:

(a)      the Administrative Agent shall have received a written Borrowing Request in accordance with the requirements hereof;

(b)      the representations and warranties of the Loan Parties set forth in this Agreement and in any other Loan Document shall be true and correct in all material respects (or, in the case of any such representation or warranty already qualified by materiality, in all respects) on and as of the date of such Term Loan (or, in the case of any such representation or warranty expressly stated to have been made as of a specific date, as of such specific date);

(c)      no Default or Event of Default shall have occurred and be continuing or would result from such Term Loan or from the application of proceeds thereof;

(d)      either of the following conditions shall have been satisfied:

(i)      the Lenders shall have approved the Proposed Use of Proceeds of such Term Loan specified in the Borrowing Request applicable to such Term Loan in accordance with the procedures specified in Section 2.03(b); or

(ii)      the Lenders shall not have approved the Proposed Use of Proceeds of such Term Loan specified in the Borrowing Request applicable to such Term Loan in accordance with the procedure specified in Section 2.03(b), the Borrower shall not subsequently have cancelled such Borrowing Request, and the Proposed Investment is the making of a bona-fide investment for which the Borrower has provided evidence satisfactory to the Lenders that it has provided at least 20% of the funds required to acquire such Proposed Investment;

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4
INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024
Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 57 of 135

(e)       the Borrower shall have provided a certification to the Administrative Agent and the Lenders that (i) the Proposed Investment is to be made solely by the Borrower or by a Designated LLC and (ii) no other Person (other than a Designated LLC or other Wholly-Owned Subsidiary of the Borrower) will have an interest in such Proposed Investment;

(f)       the Administrative Agent shall have received, if the Proposed Investment constitutes Margin Stock, (i) a form FR U-1 completed and signed by the Borrower and (ii) a certification by the Borrower in a form acceptable to the Administrative Agent and Lenders that the amount of the proceeds of the Term Loan being applied to purchase the Margin Stock does not exceed 50% of the fair market value of such Margin Stock;

(g)       the Administrative Agent shall have received a legal organizational chart of such Proposed Investment (other than a Proposed Cash Investment) showing the ownership structure of such Proposed Investment;

(h)       (i) if the Proposed Investment would require the filing of a UCC-1 financing statement or similar filing against the Borrower in order for the Administrative Agent to have a perfected security interest therein, the Borrower's acquisition of such Proposed Investment will be accomplished by utilizing a Designated LLC or another limited liability company or limited partnership agreement that meets the requirements of Section 5.15(b) and (ii) if the Proposed Investment constitutes the acquisition of Equity Interests of a limited liability company or partnership that is, or is intended to be, a Wholly-Owned Subsidiary directly owned by the Borrower, the limited liability company agreement or partnership agreement of such Subsidiary shall meet the requirements of Section 5.15(b);

(i)       on the date of the making of such Term Loan no Borrowing Base Deficiency exists and the Lenders shall have received a Borrowing Base Certificate demonstrating that no Borrowing Base Deficiency exists;

(j)       all approvals, consents, exemptions, authorizations, or other actions by, or notices to, or filings with, any Governmental Authority or any other Person necessary or required in connection with the execution, delivery or performance by, or enforcement by or against any Loan Party of any Loan Document have been duly obtained, taken or made and are in full force and effect, copies of which (if material) have been delivered to the Administrative Agent and each Lender; and

(k)       the Administrative Agent shall have received such additional information regarding the Proposed Investment as the Administrative Agent or the Lenders may reasonably request.

Each Borrowing Request by the Borrower hereunder and the making of each Term Loan shall be deemed to constitute a representation and warranty by the Borrower on and as of the date of the applicable Term Loan as to the matters specified in this Section.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and all Obligations shall have been paid in full, the Borrower covenants and agrees with the Administrative Agent and the Lenders that:

SECTION 5.01    Financial Statements.    The Borrower will furnish to the Administrative Agent and each Lender:

(a)    as soon as available, and in any event within 120 days after the end of each calendar year, a Personal Financial Statement of the Borrower as at the end of such year certified by the Borrower and the Borrower's certified independent accounts as being true, correct and complete as of the last day of such calendar year; and

(b)    as soon as available, but in any event within sixty (60) days after the end of each quarter of each calendar year of the Borrower (commencing with the quarter ending June 30, 2022), (i) a Personal Financial Statement certified by the Borrower as being true, correct and complete as of the last day of such quarter and (ii) either (x) Schedule 3.16 revised to reflect changes to the organizational chart of the Borrower and its Subsidiaries reflecting the acquisition (or disposition) of any Proposed Investment (other than a Proposed Cash Investment) and the formation or dissolution of any Subsidiary occurring during such calendar quarter or (y) a statement to the effect that no such changes have occurred during such calendar quarter;

(c)    promptly upon the filing thereof but in any event no later than October 15 of each calendar year, complete copies of the federal tax returns of Borrower, together with all schedules thereto, including without limitation all K-1 statements for all partnerships and sub-chapter S corporations, signed and certified by Borrower to be true and complete copies of such returns;

(d)    promptly upon the filing thereof copies of any request to extend the date for filing of the federal tax returns of the Borrower;

(e)    as soon as available, but in any event within 30 days after the end of each quarter of each calendar year of the Borrower (commencing with the quarter ending June 30, 2022, copies of all of Borrower's bank, brokerage, investment management, and similar account statements showing the status of such accounts as of the end of such calendar quarter;

(f)    as soon as available, but in any event within ten (10) Business Days after the end of each quarter of each calendar year of the Borrower (commencing with the quarter ending June 30, 2022), the Borrowing Base confirmation and related materials referred to in Section 5.14(a); and

(g)    for each Person (other than a natural person) for which all or a portion of the Equity Interests constitute a Proposed Investment, a copy of the quarterly financial statements (if any) of such Person or any Subsidiary of such Person, as applicable, as soon as available after the end of each fiscal quarter of such Person or such Subsidiary, as applicable.

KL2 3279308.20

SECTION 5.02    <u>Certificates; Other Information</u>.  The Borrower will deliver to the Administrative Agent and each Lender:

(a)    concurrently with the delivery of the financial statements referred to in Sections 5.01(a) and (b), a duly completed certificate signed by the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) setting forth reasonably detailed calculations demonstrating compliance with the financial covenants in Section 6.08;

(b)    promptly following any request therefor, all appraisals, valuations, rent rolls, cash flow statements, title policies, debt documents, organizational documents and other information as may be available regarding any Specified Pledged Equity Interest, Proposed Investment or any Specified Real Property Asset as the Administrative Agent or any Lender (through the Administrative Agent) may from time to time reasonably request; and

(c)    promptly following any request therefor, such other information regarding the operations, business, properties, liabilities (actual or contingent), and condition (financial or otherwise) of the Borrower, or compliance with the terms of the Loan Documents, as any Lender may from time to time reasonably request.

All documents required to be delivered by the Borrower pursuant to Section 5.01 or Section 5.02 shall be delivered electronically by the Borrower by posting in an Internet data room identified to the Borrower by the Lenders after the Closing Date and to which each Lender and the Administrative Agent shall have access, and if so posted, such documents shall be deemed to have been delivered on the date on which such documents are posted by the Borrower in such data room; <u>provided</u> that the Borrower shall notify the Administrative Agent and each Lender (by electronic mail) of the posting of any such documents.  In no event shall the Administrative Agent, the Lenders or any of their Related Parties have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrowers' or the Administrative Agent's transmission of such materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such party.

SECTION 5.03    <u>Notices</u>.  The Borrower will promptly notify the Administrative Agent and each Lender promptly following it becoming aware of any of the following:

(a)    the occurrence of any Default;

(b)    the filing or commencement of any action, suit, investigation or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower, any Loan Party, any Specified Real Property Asset, any Specified Pledged Equity Interest, or any Proposed Investment, including pursuant to any applicable Environmental Laws, that could reasonably be expected to result in liability of the Borrower in an aggregate amount exceeding $1,000,000 or have a Material Adverse Effect;

(c)    notice of any action arising under any Environmental Law or of any noncompliance by the Borrower or any Loan Party or any Specified Real Property Asset with any Environmental Law or any permit, approval, license or other authorization required thereunder that could reasonably be expected to result in liability of the Borrower and any Loan Party in an aggregate amount exceeding $1,000,000 or have a Material Adverse Effect;

(d)    the occurrence of any Borrowing Base Deficiency;

(e)    the sale or other Disposition, liquidation, dissolution, or closure or termination of any Specified Real Property Asset, Specified Pledged Equity Interest, or any Proposed Investment or the occurrence of any Material Disposition;

(f)    the occurrence of any event that has a material and adverse effect on the value of any Specified Real Property Asset, Specified Pledged Equity Interest, or Proposed Investment;

(g)    the occurrence of any default, event of default, acceleration or exercise of remedies with respect to any Specified Indebtedness or other Indebtedness;

(h)    any default under any material agreement, contract or other instrument to which any Loan Party is a party or by which any Loan Party is bound; and

(i)    any event, matter or development that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of the Borrower setting forth the details of the occurrence requiring such notice and stating what action the Borrower has taken and proposes to take with respect thereto.

SECTION 5.04    Preservation of Existence, Etc.  The Borrower will cause each Loan Party that is not a natural person to, preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization.  The Borrower will and will cause each Loan Party that is not a natural person to take all action to maintain all rights, licenses, permits, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.05    Maintenance of Properties.  The Borrower will, and will cause each Loan Party that is not a natural person to, (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in good working order and condition (ordinary wear and tear excepted) including any Specified Real Property Asset, and (b) make all necessary repairs thereto and renewals and replacements thereof, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.06    Payment of Obligations.  The Borrower will, and will cause each Loan Party to, pay, discharge or otherwise satisfy as the same shall become due and payable, all of its Indebtedness, obligations and liabilities, including Tax liabilities, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in

accordance with GAAP are being maintained, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.07    <u>Maintenance of Insurance</u>.  The Borrower will, and will cause each Loan Party to, maintain with financially sound and reputable insurance companies, insurance with respect to its properties (including any Specified Real Property Asset)and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Loan Parties) as are customarily carried under similar circumstances by such Persons.

SECTION 5.08    <u>Compliance with Laws</u>.  The Borrower will, and will cause each Loan Party to, comply with the requirements of all Applicable Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.09    <u>Environmental Matters</u>.  Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Borrower will, and will cause each Loan Party and Specified Real Property Asset to (a) comply with all Environmental Laws, (b) obtain, maintain in full force and effect and comply with any permits, licenses or approvals required for the facilities or operations of the Borrower or any of its Subsidiaries that owns, directly or indirectly, any such Specified Real Property Asset, and (c) conduct and complete any investigation, study, sampling or testing, and undertake any corrective, cleanup, removal, response, remedial or other action necessary to identify, report, remove and clean up all Hazardous Materials present or released at, on, in, under or from any of the facilities or real properties of the Borrower or any Loan Party.

SECTION 5.10    <u>Books and Records</u>.  The Borrower will maintain true and correct financial records of all of its financial transactions (other than those that are immaterial) involving the Borrower. The Borrower will cause each other Loan Party to maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrower or such Loan Party, as the case may be.

SECTION 5.11    <u>Inspection and Audit Rights</u>.

(a)    The Borrower will permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its financial and operating records, and make copies thereof or abstracts therefrom and will permit independent accounts retained by the Administrative Agent or the Lenders to conduct an audit and examination of the financial and operating books and records of the Borrower, all at the reasonable expense of the Borrower (but only to the extent such costs and expenses do not exceed $50,000 for any calendar year) and at such reasonable times during normal business hours and as often as may be reasonably requested; <u>provided</u> that the Lenders shall not exercise such rights more often than two times during any calendar year; provided, further, that when an Event of Default exists any Lender (or any of their respective representatives or independent contractors) may do any of

- 55 -

the foregoing under this Section at the expense of the Borrower and at any time during normal business hours and without advance notice..

(b)    No more than once per calendar year for each Specified Real Property Asset, the Lenders by notice to the Borrower may require the Borrower to arrange for, and deliver to the Administrative Agent and the Lenders, an appraisal prepared by an Approved Appraiser, of such Specified Real Property Asset.  The costs and expenses  of obtaining such appraisal shall be for the account of the Borrower.

SECTION 5.12    Use of Proceeds.  The Borrower will use the proceeds of each Loan in accordance with the Proposed Use of Proceeds specified in the Borrowing Request applicable to such Loan, provided that (i) such use of proceeds will not result in the Borrower being in breach of any representation, warranty or covenant contained in the Loan Documents and (ii) no portion of such proceeds will be used to purchase or carry Crypto Assets.

SECTION 5.13    Sanctions; Anti-Corruption Laws.  The Borrower will maintain in effect policies and procedures reasonably designed to promote and achieve compliance by the Borrower and the Loan Parties, and their respective directors, officers, employees, and agents with applicable Sanctions and with the FCPA and any other applicable anti-corruption laws.

SECTION 5.14    Borrowing Base Management.

(a)    *Borrowing Base Minimum Amount.* The Borrower will at all times have a Borrowing Base that is no less than the Borrowing Base Minimum Amount.

(b)    *Periodic Confirmation of Borrowing Base*.  Within thirty (30) Business Days after the end of each calendar quarter or, if an Event of Default has occurred and is continuing, within ten (10) Business Days after the written request of the Lenders, the Borrower shall provide to the Lenders all documentation reasonably requested by the Administrative Agent to establish updated amounts for the Specified Collateral Value, the Specified Collateral Indebtedness, and the Specified Pledged Percentage of the Specified Real Property Assets that are then included in the Borrowing Base. Such requested documentation shall include an appraisal, debt documentation, and other materials that the Lenders reasonably request.  Promptly after the Lender's receipt from the Borrower of the requested documents for a Specified Real Property Asset, which documents shall be in a form reasonably acceptable to the Lenders, the updated Specified Collateral Value shall be deemed to be equal to the appraised value for such Specified Real Property Asset that is set forth in the furnished appraisal (if such appraisal was prepared by an Approved Appraiser), and the updated Specified Collateral Indebtedness and updated Specified Pledged Percentage for such Specified Real Property Assets shall be determined utilizing the information contained in such documentation.  If the Borrower does not provide such information by the required date, the Specified Collateral Value, Specified Collateral Indebtedness, and Specified Pledged Percentage for each Specified Real Property Asset shall remain unchanged and the Borrower shall be deemed to have represented that there has been no adverse change in such values since the date the Borrower last provided such requested information to the Lenders.  After the determination of the updated Specified Collateral Value, updated Specified Collateral Indebtedness, and updated Specified Pledged Percentage for the relevant Specified Real Property Assets as provided above, the Borrower shall (i) recalculate the Borrowing Base Contribution for

such Specified Real Property Asset, (ii) recalculate the Borrowing Base and (iii) provide the Administrative Agent and the Lenders with a new Borrowing Base Certificate and an updated Borrowing Base Schedule acceptable to the Lenders.

(c)      *Disposition of Specified Real Property Assets*.    At least five (5) Business Days prior to the date of any Disposition of any Specified Real Property Asset included in the Borrowing Base, the Borrower shall notify the Administrative Agent and the Lenders.  Such notice shall specify (i) the Specified Real Property Asset to be Disposed of, (ii) the Borrowing Base Contribution for such Specified Real Property Asset, (iii) an updated Borrowing Base Schedule acceptable to the Lenders and a Borrowing Base certificate calculating the Borrowing Base after giving effect to such proposed Disposition and the removal of the Borrowing Base Contribution of such Specified Real Property Asset from the Borrowing Base, and (iv) unless each Lender waives in writing the requirement to make such prepayment or deposit, a certification that the Borrower will either (A) prepay the outstanding principal amount of the Term Loans as provided in Section 2.06(g) in an amount at least equal to the greater of (x) the aggregate proceeds (net of debt repayment and transaction costs) from the disposition of such Specified Real Property Asset that would fairly be allocable to the Borrower's direct or indirect ownership of the Equity Interests in such Specified Real Property Owner and (y) the Borrowing Base Deficiency that would result from the Disposition of such Specified Real Property Asset or (B) deposit an amount at least equal to the amount referred to in clause (A) in the Bank Asset Account on the date of such disposition. No such Disposition shall occur unless the payment referred to above is made on the date of such proposed Disposition. At the request of the Borrower and at the Borrower's expense, the Administrative Agent shall execute and deliver any documentation reasonably required to effectuate a release of the Administrative Agent's Lien on any Specified Pledged Equity Interests related to such Specified Real Property Asset.

(d)      *Addition of Specified Real Property Assets*.    Upon written notice to the Administrative Agent and the Lenders given at any time, the Borrower may request that the Borrowing Base be modified to include one or more additional Specified Real Property Assets. Such notice shall (i) identify the Specified Real Property Assets proposed to be included in the Borrowing Base, (ii) specify the Borrower's view as to the Specified Collateral Value, Specified Collateral Indebtedness, Specified Pledged Percentage and Borrowing Base Contribution to be ascribed to each of such Specified Real Property Assets, (iii) attach appraisals, valuations, debt documents, environmental reports, and other materials that the Borrower believes justifies its view as to the Specified Collateral Value, Specified Collateral Indebtedness, Specified Pledged Percentage, and Borrowing Base Contribution to be ascribed to each such Specified Real Property Assets, together with other materials reasonably requested by the Lenders, and (iv) specifies the date on which such proposed Specified Real Property Assets are to be added to the Borrowing Base. Within five (5) Business Days after the receipt by the Administrative Agent and the Lenders of such written notice and required documentation from the Borrower, the Lenders (after consultation with the Borrower and receipt from the Borrower of any additional diligence materials that the Lenders may request) shall notify the Borrower whether one or more of such Specified Real Property Assets shall be added to the Borrowing Base and the Specified Collateral Value (which shall be deemed to be equal to the appraised value for such Specified Real Property Asset that is set forth in the furnished appraisal (if such appraisal was prepared by an Approved Appraiser)), Specified Collateral Indebtedness and Specified Pledged Percentage (each of which shall be determined utilizing the information contained in such documentation), and Borrowing

Base Contribution to be ascribed to each Specified Real Property Asset to be added. If the Lenders fail to provide such notice within ten (10) Business Days after such request from the Borrower, none of the Specified Real Property Assets specified in such request shall be added to the Borrowing Base. After the Lenders have notified the Borrower as to which Specified Real Property Assets are to be added to the Borrowing Base, such Specified Real Property Assets shall be added to the Borrowing Base when (i) the Borrower causes each applicable Subsidiary Guarantor to become a party to the Subsidiary Guaranty via a joinder agreement and (ii) the Borrower provides, and causes each such Subsidiary Guarantor to provide, a security interest to the Administrative Agent in the Equity Interests owned by the Borrower and such Subsidiary Guarantors related to such Specified Real Property Assets. At such time, the Borrower shall re-calculate the Borrowing Base and shall provide the Administrative Agent and the Lenders with a new Borrowing Base Certificate and an updated Borrowing Base Schedule.

(e) *Exclusion of Specified Real Property Asset*. Upon written notice to the Administrative Agent and the Lenders given at any time, the Borrower may request that the Lenders consent, in the exercise of their discretion, to allow the Borrowing Base to be modified to exclude from the Borrowing Base one or more Specified Real Property Assets. Such notice shall specify (i) each Specified Real Property Asset that the Borrower requests the Lenders to exclude from the Borrowing Base, (ii) the Borrowing Base Contribution for each such Specified Real Property Asset, (iii) a Borrowing Base certificate calculating the Borrowing Base after giving effect to such proposed exclusion, and (iv) unless each Lender waives in writing the requirement to make such prepayment or deposit, a certification that the Borrower will either (A) prepay the outstanding principal amount of the Term Loans as provided in Section 2.06(g) in an amount at least equal to the Borrowing Base Contribution of such Specified Real Property Asset or (B) deposit an amount at least equal to the amount referred to in clause (A) in the Bank Asset Account on the date of such disposition. No Specified Real Property Asset may be excluded from the Borrowing Base unless the Lenders consent to such exclusion and the payment referred to above is made on the date of such proposed exclusion. At the time such exclusion becomes effective, the Borrower shall provide the Administrative Agent and the Lenders with a new Borrowing Base Certificate and an updated Borrowing Base Schedule acceptable to the Lenders.

(f) *Borrowing Base Deficiency*. If the Borrower becomes aware that a Borrowing Base Deficiency exists on any Business Day, the Borrower shall notify the Administrative Agent and the Lenders that a Borrowing Base Deficiency exists and shall specify the amount thereof. If the Administrative Agent or any Lender becomes aware that a Borrowing Base Deficiency exists on any Business Day, the Administrative Agent or the Lenders may notify the Borrower that a Borrowing Base Deficiency exists and specify the amount thereof. In either case, the Borrower shall, no later than two (2) Business Days after the date any such notice is delivered by the Borrower or the Administrative Agent and the Lenders (i) prepay the outstanding principal amount of the Term Loans in an amount at least equal to such Borrowing Base Deficiency, (ii) deposit an amount at least equal to such Borrowing Base Deficiency in the Bank Asset Account or (iii) add additional Specified Real Property Assets to the Borrowing Base in accordance with the procedures set forth in Section 5.14(d) having aggregate Borrowing Base Contributions sufficient to remove, after giving effect to a recalculation of the Borrowing Base, the then existing Borrowing Base Deficiency. If the Borrower elects to provide additional security, the Borrower shall, at the time it provides such security, (i) re-calculate the Borrowing Base and

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024

RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 65 of 135

(ii) provide the Administrative Agent and the Lenders with a new Borrowing Base Certificate and an updated Borrowing Base Schedule acceptable to the Lenders.

SECTION 5.15    Protection of Collateral and Liens; Further Assurances.

(a)    The Borrower will (i) if the Borrower possesses an unexpired driver's license, not change the name on its most recently issued unexpired driver's license without promptly giving, or causing to be given, (x) written notice to the Administrative Agent of the Borrower's new name and (y) the documents required to enable the Administrative Agent to maintain perfection of its security interest; (ii) if it does not possess an unexpired driver's license but subsequently procures a driver's license promptly give  (x) written notice to the Administrative Agent of its procurement of such driver's license and (y) the documents required to enable the Administrative Agent to maintain perfection of its security interest; and (iii) periodically, upon reasonable request by the Administrative Agent, deliver to the Administrative Agent a true and correct copy of its current driver's license;

(b)    The Borrower will, with respect to each of RH Dearborn Redevelopment JV LLC, Fox Capital LLC, each Designated LLC and each other limited liability company or limited partnership that is a Wholly-Owned Subsidiary directly owned by the Borrower and the Equity Interests in which are, or are intended to be, Collateral, cause the respective limited liability company agreement or limited partnership agreement of the applicable entity to provide at all times that each Equity Interest of such entity is certificated and is a "security" within the meaning of Article 8 of the New York UCC.

(c)    The Borrower will and will cause its Subsidiaries, upon request by the Lenders, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, security agreements, pledge agreements, financing statements (other than with respect to the Borrower) and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Administrative Agent may require from time to time in order to (i) carry out more effectively the purposes of this Agreement or any other Loan Documents, (ii) make subject to the Liens created by any of the Loan Documents any of the properties, rights or interests covered or now or hereafter intended to be Collateral, (iii) perfect and maintain the validity, effectiveness and priority of any of the Loan Documents and the Liens intended to be created thereby, and (iv) better assure, convey, grant, assign, transfer, preserve, protect and confirm unto the Administrative Agent the rights granted or now or hereafter intended to be granted to the Lender under any Credit Document; provided that notwithstanding anything to the contrary contained in this subsection (c), (x) neither the Borrower nor any of its Subsidiaries shall be required to provide a mortgage, deed of trust, assignment of leases and rents or any similar instrument with respect to any Specified Real Property Asset constituting real property and (y) with respect to any Proposed Cash Investment, neither the Borrower nor any applicable Designated LLC shall be required to obtain a control agreement for the deposit account constituting such Proposed Cash Investment.

(d)    The Borrower will and will cause its Subsidiaries (including any Subsidiary referred to in the next sentence), subject to the next two sentences and within five (5) Business Days after the acquisition of any Proposed Investment that is acquired utilizing the proceeds of a Proposed Investment Loan Amount, to execute, acknowledge, deliver, record, re-record, file, re-

file, register and re-register, all security agreements, pledge agreements, financing statements (other than with respect to the Borrower) and other agreements and filings reasonably necessary or desirable for the Administrative Agent to obtain a first priority perfected security interest in the Proposed Investment, and all such financing statements (other than with respect to the Borrower) and other filings shall be filed no later than five (5) Business Days after the date the Proposed Investment is acquired. In furtherance of the foregoing, if the Borrower proposes to acquire a Proposed Investment that requires the filing of a UCC-1 financing statement or similar filing against the Borrower in order for the Administrative Agent to have a perfected security interest therein, the Borrower agrees that it will acquire such Proposed Investment utilizing a Designated LLC or another Wholly-Owned Subsidiary that is a limited liability company or limited partnership agreement that meets the requirements of Section 5.15(b). With respect to (i) any Proposed Investment constituting real property, neither the Borrower nor any of its Subsidiaries shall be required to provide a mortgage, deed of trust, assignment of leases and rents, or any similar instrument as long as such real property is made subject to a negative pledge in favor of the Administrative Agent and all of the Equity Interests in any Person that owns such real property are pledged to the Administrative Agent and (ii) any Proposed Cash Investment, neither the Borrower nor any applicable Designated LLC shall be required to obtain a control agreement for the deposit account constituting such Proposed Cash Investment.

SECTION 5.16    Development and Redevelopment.    The Borrower will use commercially reasonable efforts to endeavor, and will cause each of its applicable Subsidiaries to use commercially reasonable efforts to endeavor, to develop as a multi-family asset any Specified Real Property Asset that has been identified to the Lenders at the time it becomes a Specified Real Property Asset as a redevelopment project.

ARTICLE VI

NEGATIVE COVENANTS

Until the Commitments have expired or been terminated and all Obligations have been paid in full, the Borrower covenants and agrees with the Administrative Agent and the Lenders that:

SECTION 6.01    Indebtedness.    The Borrower will not create, incur, assume or suffer to exist any Indebtedness (i) to the extent the creation, incurrence, assumption or suffering of such Indebtedness would result in a breach of any financial covenant set forth in Section 6.08 calculated on a pro forma basis, and (ii) if either at the time of the creation, incurrence or assumption of such Indebtedness or after giving effect thereto a Default or Event of Default has occurred and is continuing.

The Borrower will not permit any of the following Persons to create, incur, assume or suffer to exist any Indebtedness: (i) any Person (including RH Dearborn Redevelopment JV LLC, RH Dearborn Redevelopment MM LLC, Fox Capital LLC, and Hickory Park Apts Investor LLC) that is a direct or indirect Wholly-Owned Subsidiary of the Borrower that owns, directly or indirectly, Equity Interests in a Specified Real Property Owner and (ii) any Person (including, in any event, each Designated LLC) that is a direct or indirect Wholly-Owned Subsidiary of the Borrower that owns, directly or indirectly, a Proposed Investment, provided that Indebtedness

KL2 3279308.20

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024

NYSCEF DOC. NO. 4

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc

RECEIVED NYSCEF: 05/02/2024

Exhibit A    Page 67 of 135

secured by a Lien on a Proposed Investment shall be permitted if at the time such Indebtedness is incurred the Borrower complies with Section 2.06(f).

The Borrower will not permit any Specified Real Property Owner (including RH Dearborn Redevelopment LLC and Freedom Park Apartments LLC) to create, incur, or assume after the Closing Date any Indebtedness unless (i) such Indebtedness is on terms no less favorable to such Specified Real Property Owner and, indirectly, the Borrower than those contained in the documents governing Indebtedness of such Specified Real Property Owner in effect on the Closing Date and (ii) unless each Lender waives in writing the requirement to make such prepayment, all proceeds of such Indebtedness (net of debt repayment and transaction costs) that would fairly be allocable to the Borrower's direct or indirect ownership of the Equity Interests in such Specified Real Property Owner shall be applied as provided in Section 2.06(h).

SECTION 6.02    Liens.  The Borrower will not create, incur, assume or suffer to exist any Lien upon any of the following:

(a)    any Proposed Investments financed in whole or in part with the proceeds of any Term Loan, other than (i) Permitted Liens and (ii) Liens to secure Indebtedness provided that at the time such Lien is created the Borrower complies with Section 2.06(f);

(b)    any Collateral, other than Permitted Liens;

(c)    the Bank Asset Account or any amounts credited thereto or on deposit therein, other than Permitted Liens; and

(d)    any CBRM Equity or Crown Capital Equity, other than (i) Permitted Liens and (ii) a pledge of such Equity Interests to a commercial bank or other institution that accepts deposits and is in the business of commercial lending (excluding, for the avoidance of doubt, any asset manager, credit fund, hedge fund, private equity fund, or direct lender).

The Borrower will not permit any of the following Persons to create, incur, assume or suffer to exist any Liens on its respective assets: (i) any Person (including RH Dearborn Redevelopment JV LLC, RH Dearborn Redevelopment MM LLC, Fox Capital LLC, and Hickory Park Apts Investor LLC) that is a direct or indirect Wholly-Owned Subsidiary of the Borrower that owns, directly or indirectly, Equity Interests in a Specified Real Property Owner and (ii) any Person (including, in any event, each Designated LLC) that is a direct or indirect Wholly-Owned Subsidiary of the Borrower that owns, directly or indirectly, a Proposed Investment, provided that this clause (ii) shall not prohibit a Lien that is incurred or created in compliance with the requirements of Section 6.02(a).

The Borrower will not permit, authorize, consent to, or suffer to exist the filing in any jurisdiction of any UCC-1 financing statement or fixture filing naming the Borrower as debtor.

SECTION 6.03    Dispositions.  The Borrower will not:

(a)    make any Disposition or enter into any agreement to make any Disposition, provided that any such Disposition (other than a Disposition referred to in subsections (b), (c), and (d) below which shall be governed by such subsections) shall be permitted as long as after giving

- 61 -

effect to any such Disposition (i) such Disposition constitutes a bona fide arm's length transaction, (ii) the Borrower would not be in breach of any financial covenant contained in Section 6.08 calculated on a pro forma basis, (iii) no Default or Event of Default has occurred and is continuing, (iv) no Borrowing Base Deficiency exists calculated on a pro forma basis and (v) in the case of (x) a Disposition of Specified Pledged Equity Interests, such transaction is permitted by Section 5.14(c) and (y) in the case of a Disposition in whole or in part of a Proposed Investment, such Disposition is accompanied by the prepayment of the Loans or deposit of funds into the Bank Asset Account as required by Section 2.06(c);

(b)     make, or permit its Subsidiaries to make, any Material Disposition, or enter into, or permit its Subsidiaries to enter into, any agreement to make any Material Disposition, provided that any such Material Disposition (other than a Disposition referred to in subsections (c) and (d) below which shall be governed by such subsections) shall be permitted if (i) such Material Disposition constitutes a bona fide arm's length transaction and (ii) is accompanied by the prepayment of the Term Loans or deposit of funds into the Bank Asset Account as required by Section 2.06(d);

(c)     make, or permit any of its Subsidiaries to make, any Disposition of more than 50% of either the CBRM Realty Equity or Crown Capital Equity directly or indirectly owned by the Borrower as of the Closing Date or make, or permit any of its Subsidiaries to make, any Disposition or take any other action which results in the Borrower no longer Controlling CBRM Realty or Crown Capital unless such Disposition is accompanied by the prepayment of the Term Loans or deposit of funds into the Bank Asset Account as required by Section 2.06(e); and

(d)     except as contemplated by Section 5.14(c), permit any of the following Persons to Dispose of any of its assets or issue any of its Equity Interests to any Person other than the Borrower: (i) any Person (including RH Dearborn Redevelopment JV LLC, RH Dearborn Redevelopment MM LLC, Fox Capital LLC, and Hickory Park Apts Investor LLC) that is a direct or indirect Wholly-Owned Subsidiary of the Borrower that owns, directly or indirectly, Equity Interests in a Specified Real Property Owner  and (ii) any Person (including, in any event, each Designated LLC) that is a direct or indirect Wholly-Owned Subsidiary of the Borrower that owns, directly or indirectly, a Proposed Investment.

Notwithstanding anything in this Section 6.03 to the contrary, the Borrower shall not Dispose of any property or other assets (including for estate planning purposes) to (A) a Family Member, (B) a charitable institution or foundation, or (C) a trust, special purpose entity or similar vehicle (other than to a Designated LLC to the extent expressly provided herein) for the benefit of the Borrower, a Family Member, charitable institution or foundation, that is inconsistent with Borrower's past practices and that, taken together with amounts of any Investment made pursuant to the last sentence of Section 6.04, has an aggregate value for any calendar year in excess of $5,000,000.

SECTION 6.04     Investments.     The Borrower will not make any Investments outside the ordinary course of business of the Borrower other than Investments made for bona fide investment purposes where the proceeds of such Investments are reasonably be expected to be utilized for such proposed investment purpose within three months after the date such Investment is made, provided that at the time such Investment is made (i) the Borrower would not be in breach of any financial covenant contained in Section 6.08 calculated on a pro forma basis, (ii) no Default

or Event of Default has occurred and is continuing, and (iii) no Borrowing Base Deficiency exists calculated on a pro forma basis. Notwithstanding the foregoing, the Borrower shall not make or provide any Investment to (i) a Family Member, (ii) a charitable institution or foundation, (iii) a trust, special purpose entity or similar vehicle (other than to a Designated LLC to the extent expressly provided herein) for the benefit of the Borrower, a Family Member, charitable institution or foundation, that is inconsistent with Borrower's past practices and that, taken together with amounts of any Disposition made pursuant to the last sentence of Section 6.03, has an aggregate value for any calendar year in excess of $5,000,000.

SECTION 6.05    Restriction on Use of Proceeds; Margin Regulations; Crypto Assets.  The Borrower will not use the proceeds of any Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock, or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, in each case, in violation of Regulations T, U or X or (ii) to purchase or carry, or to provide funds to any Subsidiary to enable that Subsidiary to purchase or carry, any Crypto Assets.

SECTION 6.06    Restriction on Amendments to Organizational Documents and Consents; Residence.

(a)    The Borrower will not consent to or permit any amendment, supplement or other modification of the Organizational Documents of any of the following Persons: (i) any Specified Real Property Owner, (ii) any Person (including RH Dearborn Redevelopment JV LLC, RH Dearborn Redevelopment MM LLC, Fox Capital LLC, and Hickory Park Apts Investor LLC) that is a direct or indirect Wholly-Owned Subsidiary of the Borrower that owns, directly or indirectly, Equity Interests in a Specified Real Property Owner, (iii) any Person (including, in any event, each Designated LLC) that is a direct or indirect Wholly-Owned Subsidiary of the Borrower that owns, directly or indirectly, a Proposed Investment, and (iv) the Equity Interests, if any, of any Person that is a Proposed Investment, in each case for clauses (i) through (iv), except for (x) any immaterial amendment that could not reasonably be expected to have an adverse effect on the rights or interests of the Lenders or on the validity, perfection, priority or value of any Collateral or (y) an amendment required by Applicable Law; provided that if the lenders providing financing with respect to any Specified Real Property Asset require such an amendment the Lenders will permit such amendment as long as the Borrower removes such Specified Real Property Asset from the Borrowing Base in compliance with Section 5.14(e) at or before the time such amendment becomes effective.

(b)    The Borrower will not consent to, and will not permit RH Dearborn Redevelopment LLC or Freedom Park Apartments LLC to consent to, any amendment, supplement or other modification of the Dearborn Consent or the Freedom Park Consent (and the corresponding provisions of the loan agreement referred to in such consent that have been amended by such consent) as in effect on the Closing Date.

(c)    The Borrower will not establish its residence outside the United States of America nor will it permit any other Loan Party to be incorporated or formed under the laws of any jurisdiction other than a State of the United States or the District of Columbia.

KL2 3279308.20

SECTION 6.07    Sanctions; Anti-Corruption Use of Proceeds. The Borrower will not, directly or, to the best of its knowledge, indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable anti-corruption law, or (ii) (A) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or (B) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as Administrative Agent, Lender, underwriter, advisor, investor, or otherwise).

SECTION 6.08    Financial Covenants.

(a)    Net Worth.  The Borrower will not permit its Net Worth to be less than $300,000,000 at any time.

(b)    Total Debt to Asset Ratio.  The Borrower will not permit its Total Debt to Asset Ratio to exceed 65% at any time.

(c)    Minimum Liquidity.  The Borrower will not permit Liquidity owned by, and held in the name of, the Borrower to be less than $10,000,000 at any time.

(d)    Valuation.  For purposes of Sections 6.08(a) and 6.08(b), the Borrower's calculation of Net Worth and the Total Debt to Asset Ratio will be based on the fair market value of all assets of the Borrower and its consolidated Subsidiaries (other than Crypto Assets which shall be valued as specified in the definition thereof). The Lenders, no more frequently than once during each calendar year, shall be entitled to require the Borrower to provide a list of the assets of the Borrower and its consolidated Subsidiaries and the fair market value that the Borrower is ascribing to each of such assets for purposes of its calculation of Net Worth and the Total Debt to Asset Ratio.  If the Lenders disagree with the valuation of one or more of such assets provided by the Borrower, the Lenders shall be entitled, at the Borrower's expense, to hire a valuation expert to provide a valuation of such assets.  The valuation provided by the Lenders' valuation expert shall be the valuation used for the purpose of the Borrower's calculation of  Net Worth and the Total Debt to Asset Ratio unless the Borrower promptly notifies the Lenders that it disagrees with the Lender's valuation promptly after its receipt thereof.  If the Borrower delivers such notice the Borrower shall be entitled to propose for consideration by the Lenders a valuation developed by a valuation expert retained by the Borrower.  If, after the Borrower has provided such valuation, the Borrower and the Lenders still cannot agree on the valuation to be ascribed to one or more assets, the valuation experts selected by the Borrower and the Lenders shall, at the Borrower's expense, select a neutral valuation expert and the valuation provided by that expert shall be the valuation to be ascribed to one or more assets for the purpose of the Borrower's calculation of  Net Worth and the Total Debt to Asset Ratio.

SECTION 6.09    Bank Asset Account.

(a)    The Borrower will not withdraw any funds from the Bank Asset Account without the prior written consent of the Lenders.

KL2 3279308.20

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK   Doc 1-1   Filed 07/18/25   Entered 07/18/25 12:43:34   Desc
Exhibit A   Page 71 of 135

(b)     The Borrower will provide to the Lenders a copy of all written communications it receives from the Depository regarding the Bank Asset Account, including all periodic bank statements.

SECTION 6.10     Limitation on Business of Designated LLCs.  No Designated LLC shall incur any obligations, make any investments or conduct any business other than holding a Proposed Investment or a Wholly Owned Subsidiary that holds, directly or indirectly a Proposed Investment, if applicable, and such tasks as are required to maintain its existence.

ARTICLE VII

EVENTS OF DEFAULT

SECTION 7.01     Events of Default.  If any of the following events (each, an "Event of Default") shall occur:

(a)     the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     the Borrower shall fail to pay any interest on any Loan, or any fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of two or more Business Days;

(c)     any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with any Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document, shall prove to have been untrue or incorrect in any material respect (or, in the case of any such representation or warranty that is already qualified by materiality, such representation or warranty shall prove to have been untrue or incorrect) when made or deemed made which, if such untruth or incorrectness is curable, is not cured within thirty (30) days following Borrower's knowledge or notice thereof;

(d)     the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.03(a), 5.03(d), 5.04 (first sentence), 5.11, or 5.12 or in Article VI;

(e)     the Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Section) and such failure shall continue unremedied for a period of 30 or more days after notice thereof by the Administrative Agent to the Borrower;

(f)     (i) any Person shall fail to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Specified Indebtedness (other than Indebtedness under the Loan Documents), in each case beyond the applicable grace period with respect thereto, if any; or (ii) any Person shall fail to observe or perform any other agreement or condition relating to any such Specified Indebtedness or contained

- 65 -

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4
INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024
Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 72 of 135

in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders or beneficiary or beneficiaries of such Specified Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Specified Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity and which default or other event has not been waived within five (5) Business Days following the occurrence thereof; provided that this clause (f)(ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such Indebtedness;

(g)      (i) the Borrower, any Loan Party, CBRM Realty or Crown Capital shall fail to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of Indebtedness (other than Indebtedness under the Loan Documents and Specified Indebtedness) having an aggregate principal amount exceeding the Applicable Threshold, in each case beyond the applicable grace period with respect thereto, if any; or (ii) the Borrower or any Loan Party shall fail to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity and which default or other event has not been waived within five (5) Business Days following the occurrence thereof; provided that this clause (g)(ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such Indebtedness;

(h)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Loan Party or its debts, or of a substantial part of its assets, under any Debtor Relief Law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of 60 or more days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)      any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Debtor Relief Law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (g) of this Section, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for itself or for a substantial part of its assets, (iv) file an answer admitting the material allegations of

a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)     the Borrower or any Loan Party shall become unable, admit in writing its inability or fail generally, to pay its debts as they become due;

(k)     there is entered against the Borrower or any Loan Party (i) a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $5,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage), or (ii) a non-monetary final judgment or order that, either individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect or (C) such judgment is not paid, vacated, satisfied, dismissed, discharged or bonded within thirty (30) days following entry thereof; or

(l)     any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all Obligations, ceases to be in full force and effect; or the Borrower or any other Person contests in writing the validity or enforceability of any provision of any Loan Document; or the Borrower denies in writing that it has any or further liability or obligation under any Loan Document, or purports in writing to revoke, terminate or rescind any Loan Document; or

(m)     either (i) any security interest purported to be created by any Collateral Document shall cease to be, or shall be asserted in writing by any Loan Party, not to be, a valid and perfected security interest (perfected as or having the priority required by this Agreement or the relevant Collateral Document and subject to such limitations and restrictions as are set forth herein and therein) in the assets or properties covered thereby, or (ii) the Subsidiary Guaranty shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by any Subsidiary Guarantor not to be in effect or not to be legal, valid and binding obligations (other than in accordance with the terms thereof); or

(n)     the conviction for, or plea of guilty or no contest to any felony by, the Borrower or any Loan Party that (individually or in the aggregate with any other event(s)) would be reasonably likely to have or has had either (1) a Material Adverse Effect as to the Borrower or (2) a material adverse impact on the business, reputation or standing of the Lenders; or

(o)     the Borrower dies, becomes totally disabled, or is determined or adjudged incompetent or otherwise incapacitated by a court of competent jurisdiction;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Section), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times:

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK   Doc 1-1   Filed 07/18/25   Entered 07/18/25 12:43:34   Desc
Exhibit A   Page 74 of 135

(i)     terminate the Commitments, and thereupon the Commitments shall terminate immediately;

(ii)     declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower;  and

(iii)     exercise on behalf of itself, and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and Applicable Law;

provided that, in case of any event with respect to the Borrower described in clauses (h) and (i) of this Section, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other Obligations accrued hereunder, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

Notwithstanding the foregoing, in the case of an Event of Default under Section 7.01(o), the Commitments shall automatically terminate but the Lenders hereby agree not to exercise the remedies specified in clauses (ii) and (iii) of the preceding paragraph until the date that is the earlier of (x) sixty (60) days after the date on which such Event of Default occurs and (y) the date on which any other Event of Default occurs; provided that the foregoing shall not prevent the Administrative Agent and the Lenders from taking any actions during such sixty (60) day period as may be necessary or  advisable to protect and defend its rights under the Loan Documents and the validity, perfection and priority of its Liens in the Collateral.

SECTION 7.02   Application of Payments.   Notwithstanding anything herein to the contrary, following the occurrence and during the continuance of an Event of Default, and notice thereof to the Administrative Agent by the Borrower or the Required Lenders, all payments received on account of the Obligations shall, subject to Section 2.21, be applied by the Administrative Agent as follows:

(i)     first, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees and disbursements and other charges of counsel payable under Section 9.03 and amounts payable under the Administrative Agent Fee Letter) payable to the Administrative Agent in its capacity as such;

(ii)     second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees and disbursements and other charges of counsel payable under Section 9.03) arising under the Loan Documents, ratably among them in proportion to the respective amounts described in this clause (ii) payable to them;

KL2 3279308.20

(iii)    third, to payment of that portion of the Obligations constituting accrued and unpaid charges and interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause (iii) payable to them;

(iv)    fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans ratably among the Lenders in proportion to the respective amounts described in this clause (iv) payable to them;

(v)    fifth, to the payment in full of all other Obligations, in each case ratably among the Administrative Agent and the Lenders based upon the respective aggregate amounts of all such Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

(vi)    finally, the balance, if any, after all Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

SECTION 7.03    Required Sale of Specified Real Property Assets.

(a)    Required Sale. Without limitation of any other right or remedy set forth in any Loan Document, if (i) an Event of Default shall have occurred that is continuing and (ii) all Obligations have not been paid in full on or prior to the date that is three (3) months following the occurrence of such Event of Default that is continuing, then the Borrower shall use commercially reasonable efforts to cause the Specified Real Property Owners to sell all such Specified Real Property Assets as may be necessary to pay in full all Obligations. In connection with such sale, (A) the Borrower shall use commercially reasonable efforts to cause each Specified Real Property Owner to sell, to a bona fide third party in accordance with this Section, such Specified Real Property Assets within three (3) months, (B) to the extent the Borrower has a right to consent to or direct a sale, or with commercially reasonable efforts can procure such right, the Borrower shall not, and shall not permit any applicable Specified Real Property Owner to sell or transfer any applicable Specified Real Property Asset other than in accordance with this Section, and (C) the Borrower shall cause the applicable Specified Real Property Owners to engage the services of an independent institutional real estate brokerage firm (the "Sales Broker") to solicit offers from third parties unaffiliated with the Borrower or any Affiliate thereof. Within five (5) Business Days after the Borrower' determination to sell any Specified Real Property Assets pursuant to this Section, the Borrower shall notify the Lenders and the Administrative Agent in writing of all such Specified Real Property Assets that the Borrower intends to cause the applicable Specified Real Property Owners to sell, together with a calculation of the anticipated net proceeds resulting from such sale. To the extent the Borrower has a right to consent to or direct a sale, or with commercially reasonable efforts can procure such right, the Borrower shall not, and shall not permit any Specified Real Property Owner to, sell or permit the sale, or enter into any binding agreement to sell, any Specified Real Property Assets for an amount that would not be sufficient to pay in full all Obligations without the prior written consent of Lenders, which consent may be withheld in Lenders' sole discretion.

(b)    Lender Controlled Sale. Subject to Section 7.03(c), if any of the Obligations have not been paid in full on or prior to the date that is six (6) months following the occurrence of

an Event of Default that is continuing, then, upon the written request of the Lenders, the Borrower shall, and shall cause each applicable Specified Real Property Owner to, use commercially reasonable efforts to engage, retain and cooperate with an independent institutional real estate brokerage firm selected by the Lenders ("Lender Approved Sales Broker") and shall use commercially reasonable efforts to comply, and cause each applicable Specified Real Property Owner to comply, with the instructions of the Lenders in connection with the marketing and sale of such Specified Real Property Asset, including, without limitation, (i) the selection of any purchaser, (ii) the acceptance of any purchase price, (iii) the entrance into any purchase and sale agreement or similar agreement with respect to such sale and (iv) the consummation of the sale of the related Specified Real Property Asset pursuant to such purchase and sale agreement or similar agreement. The Borrower, on behalf of itself and each Specified Real Property Owner and other Subsidiary, hereby waives any duty (fiduciary or otherwise) of any Lender or the Administrative Agent in connection with any such marketing or sale effort, it being understood and agreed that the Borrower and each such Specified Real Property Owner is fully responsible for any and all circumstances bearing on the risk of the exercise of Lenders' and the Administrative Agent's remedies hereunder. The Borrower, on behalf of itself and each Specified Real Property Owner (each, a "Releasing Party"), hereby absolutely, unconditionally and irrevocably releases and forever discharges the Lenders, the Administrative Agent and their Related Parties (each, a "Released Party" and, collectively, the "Released Parties") from the following (collectively, the "Released Claims"): all claims, actions, causes of action, suits, debts, liabilities, obligations, sums of money, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments, executions, claims and demands arising out of, relating to or in any way connected with any Released Party's exercise of its rights or remedies under this Section, whether known or unknown, suspected or unsuspected, absolute or contingent, direct or indirect or nominally or beneficially possessed or claimed by a Releasing Party, whether the same be in administrative proceedings, in arbitration, at law, in equity or mixed, which such Releasing Party ever had, now has or hereafter can, shall or may have against the Released Parties (or any of them), in respect of any and all agreements, liabilities, actions or obligations entered into or incurred on or after the date hereof in connection with this Section. The Borrower hereby irrevocably covenants to refrain, and to cause the Specified Real Property Owners to refrain, from asserting any claim or demand, or commencing, instituting or causing to be commenced or instituted, any action, suit or proceeding of any kind against any Released Party.  The Borrower shall not, and shall cause each applicable Specified Real Property Owner and Subsidiary not to, interfere with, hinder or delay any marketing or sale efforts with respect to any Specified Real Property Asset pursuant to this Section.

(c)    Extension of Time for Commencement of Lender Controlled Sale.  If any of the Obligations have not been paid in full on or prior to the date that is six (6) months following the occurrence of an Event of Default that is continuing due to the failure of any Specified Real Property Asset to be sold on or prior to such date, the six (6) month period referred to in the first sentence of Section 7.03(b) shall be extended with respect to such Specified Real Estate Asset (but, for the avoidance of doubt, not for other Specified Real Estate Assets), for a period, not exceeding an additional six (6) months, as long as such Specified Real Property Asset is subject to a bona fide sale contract that is then in effect and the Borrower is exercising commercially reasonable efforts to facilitate the satisfaction of all conditions to the closing of such sale.  If such Specified Real Property Asset has not been sold by the conclusion of the period referred to in the prior sentence, the Lenders shall be entitled to exercise their rights under Section 7.03(b).

(d) <u>Costs</u>. The Borrower shall be responsible for all costs and expenses incurred in connection with the marketing and sale of each Specified Real Property Asset pursuant to this Section, including, without limitation, all transfer taxes, brokerage fees and commissions, prepayment penalties and breakage fees, and attorneys' fees. All proceeds, net of any applicable taxes and other transaction expenses, received by any Specified Real Property Owner or any other Subsidiary in connection with any such sale shall promptly be paid to the Administrative Agent on behalf of Lenders with such payment applied toward any outstanding Specified Indebtedness for such Specified Real Property Asset as well as the remaining Obligations.

## ARTICLE VIII

## AGENCY

SECTION 8.01  <u>Appointment and Authority</u>.  Each of the Lenders hereby irrevocably appoints Acquiom Agency Services LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Except as otherwise provided in Section 8.06(b), the provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

SECTION 8.02  <u>Rights as a Lender</u>.  The Person serving as the Administrative Agent hereunder, if it is also a Lender, shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its branches and Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 8.03  <u>Exculpatory Provisions</u>.

(a)  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent:

(i)  shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may cause a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its branches or Affiliates in any capacity.

(b)     The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 7.01 and 9.02), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. The Administrative Agent may request that the Required Lenders or other parties deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Loan Documents. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Borrower or a Lender.

(c)     The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. The Administrative Agent shall have no responsibility for or liability with respect to monitoring compliance of any other party to the Loan Documents or any other document related hereto or thereto. The Administrative Agent has no duty to monitor the value or rating of any Collateral on an ongoing basis. The Administrative Agent shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith or for any mistake in act or law, or for anything which it may do or refrain from doing in connection herewith, in each case except for its own gross negligence or willful misconduct. In no event shall the Administrative

Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, epidemics, pandemics, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services. Notwithstanding anything in the Loan Documents to the contrary, the Administrative Agent shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

SECTION 8.04    Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 8.05    Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

SECTION 8.06    Resignation of Administrative Agent.

(a)    The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4
INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 80 of 135

not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)     If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by Applicable Law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) except for any indemnity payments owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring or removed Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

SECTION 8.07    Non-Reliance on Administrative Agent and Other Lenders. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and certain other facilities set forth herein and (ii) it is engaged in making, acquiring or holding commercial loans or providing other similar facilities in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial

- 74 -

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4
INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 81 of 135

instrument, and each Lender agrees not to assert a claim in contravention of the foregoing. Each Lender represents and warrants that it is sophisticated with respect to decisions to make, acquire or hold commercial loans, and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

SECTION 8.08    [Reserved].

SECTION 8.09    Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 9.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 9.03.

SECTION 8.10    Collateral and Guaranty Matters.

(a)    Each Lender hereby further authorizes the Administrative Agent on behalf of and for the benefit of the Secured Parties, to be the representative of the Secured Parties with respect to the Collateral Documents.  The Lenders irrevocably authorize the Administrative Agent to release any Lien on any property granted to or held by Administrative Agent under any Loan Document and the guarantees provided by the Loan Parties under any Loan Document (i) upon payment in full of the Obligations, (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document (and the Administrative Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry) to any person other than a Loan Party, or (iii) subject to Section 9.02, if the release of such Lien is

approved, authorized or ratified in writing in accordance with Section 9.02.  Without in any way diminishing the authority granted to the Administrative Agent under the preceding sentence, within ten (10) Business Days after written request by the Administrative Agent at any time, each of the Lenders agrees to confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property in accordance with this Section and the failure of any Lender to deliver any such requested confirmation shall be deemed to be a confirmation by such Lender of the Administrative Agent's authority.

(b)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent or as the Required Lenders may require or otherwise direct, for the benefit of all the Lenders or the Secured Parties, as applicable; provided, however, that the foregoing shall not prohibit (i) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (ii) [reserved], (iii) any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (iv) any Lender from filing proofs of claim on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law.

SECTION 8.11     Erroneous Payments.

(a)     Each Lender hereby agrees that if the Administrative Agent notifies such Lender (any such Lender or other recipient, a "Payment Recipient") in writing that the Administrative Agent has determined in its reasonable discretion that the Administrative Agent or its Affiliates mistakenly transmitted funds to such Payment Recipient (as a result of a clerical, mechanical or technological error, whether or not known to such Payment Recipient) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands in writing the return of such Erroneous Payment (or a portion thereof), such Payment Recipient shall make commercially reasonable efforts to promptly return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a written demand was made, in same day funds (in the currency so received).  A notice from the Administrative Agent to any Lender under this Section 8.11(a) shall set forth the facts and circumstances resulting in such Erroneous Payment; provided that the Administrative Agent shall not make any demand under this Section 8.11(a) unless the notice described herein is delivered within 30 days after the making of the applicable Erroneous Payment.

(b)     Each Payment Recipient hereby authorizes the Administrative Agent to set off, net and apply any amounts at any time owing to such Payment Recipient under any Loan Document against any amount due to the Administrative Agent under the preceding clause (a).

(c)     The Borrower and each other Loan Party hereby agrees that (i) in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient (and without limiting the Administrative Agent's rights and remedies under this Section 8.11), the Administrative Agent shall be subrogated to all the rights of such Payment Recipient with respect

to such amount and (ii) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; provided that this Section 8.11 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (i) and (ii) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making a payment on the Obligations. If the amount of any Erroneous Payment is subsequently recovered by the Administrative Agent or its Affiliate, the Administrative Agent or its Affiliate shall return to the applicable Payment Recipient either (x) the Loans acquired pursuant to this clause (c), or (y) if applicable, the proceeds of such Loans.

(d)    In addition to any rights and remedies of the Administrative Agent provided by law, the Administrative Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 8.11 and which has not been returned to the Administrative Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Administrative Agent or any Affiliate, branch or agency thereof to or for the credit or the account of such Lender. The Administrative Agent agrees promptly to notify the Lender after any such setoff and application made by Administrative Agent; provided that the failure to give such notice shall not affect the validity of such setoff and application.

(e)    Each party's obligations under this Section 8.11 shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

(f)    Notwithstanding the foregoing, the Lenders and Payment Recipients shall have no obligation under this Section 8.11 to the extent that, as a result of the Erroneous Payment or in connection therewith (or as a result of the actions described above), (i) the Liens securing the Obligations have been released, the perfection or priority of the Liens has been impaired, or any applicable preference period would be deemed re-started or (ii) the applicable Payment Recipient's claim against any Loan Party would be impaired as a result of such Erroneous Payment.

(g)    Notwithstanding anything to the contrary herein or in any other Loan Document, none of the Loan Parties shall have any obligations or liabilities directly or indirectly arising out of this Section 8.11 in respect of any Erroneous Payment.

## ARTICLE IX

## <u>MISCELLANEOUS</u>

SECTION 9.01    <u>Notices; Public Information</u>.

(a)    <u>Notices Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email as follows:

(i)    if to the Borrower, to it at 46 Main Street, Suite 339, Monsey, New York 10952 (Telephone No. (845) 538-6701; Email: <u>mark@cbrmrealty.com</u>; and

(ii)    if to the Administrative Agent or a Lender, to it at its address (or facsimile number or email address) set forth on Schedule 9.01(a) hereto.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    <u>Electronic Communications</u>.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail, FpML, and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    <u>Change of Address, etc</u>.  Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 9.02    <u>Waivers; Amendments</u>.

(a)    <u>No Waiver; Remedies Cumulative; Enforcement</u>.  No failure or delay by the Administrative Agent or any Lender in exercising any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege, or any abandonment or discontinuance of steps to enforce such a right remedy, power or privilege, preclude any other or further exercise thereof or the exercise of any other right remedy, power or privilege.  The rights, remedies, powers and privileges of the Administrative Agent and the Lenders hereunder and under the Loan Documents are cumulative and are not exclusive of any rights, remedies, powers or privileges that any such Person would otherwise have.

(b)    <u>Amendments, Etc</u>.  Except as otherwise expressly set forth in this Agreement (including Section 2.20), no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower therefrom, shall be effective unless in writing executed by the Borrower and the Required Lenders, and acknowledged by the Administrative Agent, or by the Borrower and the Administrative Agent with the consent of the Required Lenders, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u> that no such amendment, waiver or consent shall:

(i)    extend or increase any Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Article IV or the waiver of any Default shall not constitute an extension or increase of any Commitment of any Lender);

(ii)    reduce the principal of, or rate of interest, including default rate interest, specified herein on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly and adversely affected thereby;

(iii)    postpone any date scheduled for any payment of principal of, or interest on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, without the written consent of each Lender directly and adversely affected thereby;

(iv)    change Section 2.12(b) or Section 2.13 in a manner that would alter the pro rata sharing of payments required thereby or change Section 7.02, in each case, without the written consent of each Lender directly and adversely affected thereby;

(v)    waive any condition set forth in Section 4.01 or 4.02 without the written consent of each Lender; or

KL2 3279308.20

(vi)     change any provision of this Section or the percentage in the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(vii)     without the written consent of such Lender, release (x) all or substantially all the Collateral except to the extent sold or otherwise disposed of in a transaction permitted by this Agreement or the other Loan Documents, (y) all or substantially all of the value of the guarantees by the Subsidiary Guarantors under the Subsidiary Guarantee except to the extent sold or otherwise disposed of in a transaction permitted by this Agreement or the other Loan Documents;

(viii)     without the written consent of such Lender, (x) contractually subordinate the Borrower's obligations under this Agreement to pay the Obligations or all or substantially all the value of the guarantees under the Subsidiary Guarantee or (y) contractually subordinate all or substantially all the Collateral from the Liens of the Collateral Agreements;

provided, further, that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights or duties hereunder or under any other Loan Document of the Administrative Agent, unless in writing executed by the Administrative Agent in addition to the Borrower and the Lenders required above.

Notwithstanding anything herein to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent that by its terms requires the consent of all the Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that (x) the Commitment of any Defaulting Lender may not be increased or extended, or the maturity of any of its Loan may not be extended, the rate of interest on any of its Loans may not be reduced and the principal amount of any of its Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, waiver or consent requiring the consent of all the Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender.

In addition, notwithstanding anything in this Section to the contrary, if the Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision, and, in each case, such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders to the Administrative Agent within ten Business Days following receipt of notice thereof.

SECTION 9.03     Expenses; Indemnity; Damage Waive.

KL2 3279308.20

(a)    <u>Costs and Expenses</u>.    The Borrower shall pay (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent, the Lenders, and their respective Affiliates (including costs and expenses for Other Taxes, appraisals, background checks, travel (including lodging and meals while travelling), accountants, auditors, consultants, and the reasonable fees, charges and disbursements of separate counsel for each of the Administrative Agent and the Lenders), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including Other Taxes, the fees, charges and disbursements of separate counsel for each of the Administrative Agent and the Lenders, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans. The Administrative Agent and the Lenders acknowledge that the Borrower has deposited (i) $75,000 to Kramer Levin Naftalis & Frankel LLP, counsel to the Lenders, prior to the Closing Date as an advance payment of the fees, charges and disbursements of such counsel and (ii) $75,000 to the Lenders prior to the Closing Date as an earnest money deposit (the "<u>Earnest Money Deposit</u>") .

(b)    <u>Indemnification by the Borrower</u>.    The Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the documented fees, charges and disbursements of any counsel for any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or the  receipt of any Collateral or the exercise of any remedies against any Collateral, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any environmental liability related in any way to the Borrower, any Loan Party, or the Collateral, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Borrower against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) result from a claim not involving an act or omission of the Borrower and that is brought by an Indemnitee against another Indemnitee (other than against the Administrative Agent in its capacity as such). Paragraph (b) of this Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

KL2 3279308.20

(c)     <u>Reimbursement by Lenders</u>.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Applicable Percentage at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), in connection with such capacity.   The obligations of the Lenders under this paragraph (c) are subject to the provisions of Section 2.12(e).

(d)     <u>Waiver of Consequential Damages, Etc</u>.  To the fullest extent permitted by Applicable Law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)     <u>Payments</u>.  All amounts due under this Section shall be payable not later than fifteen (15) days after demand therefor.

(f)     <u>Survival</u>.  Each party's obligations under this Section shall survive the termination of the Loan Documents and payment of the obligations hereunder.

SECTION 9.04     <u>Successors and Assigns</u>.

(a)     <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any other attempted assignment or transfer by any party hereto shall be null and void), and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (e) of this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

KL2 3279308.20

(b)     <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)     <u>Minimum Amounts</u>.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment or the Loans at the time owing to it or contemporaneous assignments to or by related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in paragraph (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in paragraph (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "<u>Trade Date</u>" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000, unless each of the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)     <u>Proportionate Amounts</u>.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

(iii)     <u>Required Consents</u>.  No consent shall be required for any assignment by the Lenders except to the extent required by paragraph (b)(i)(B) of this Section regarding the minimum amount that may be assigned and except that:

(A)     the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) a Default or Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; <u>provided</u> that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof; and

KL2 3279308.20

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM

NYSCEF DOC. NO. 4

INDEX NO. 652265/2024

RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 90 of 135

(B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund.

(iv)      <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, and the assigning lender shall pay a processing and recordation fee of $3,500 to the Administrative Agent; <u>provided</u> that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment**.**

(v)      <u>No Assignment to Certain Persons</u>.  No such assignment shall be made to (A) the Borrower or any of the Borrower's Affiliates or Subsidiaries or (B) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof.

(vi)      <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person).

(vii)      <u>Certain Additional Payments</u>.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in

KL2 3279308.20

the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.15 and 9.03 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)    Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed and shall not be required if a Default or Event of Default shall have occurred and be continuing), but without notice to the Administrative Agent, sell participations to any Person (other than a natural person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights or obligations under this Agreement (including all or a portion of its Commitment or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent, and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 9.03(b) with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 9.02(b)(i) through (viii) that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.14, 2.15 and 2.16 (subject to the requirements and limitations therein, including the requirements under Section 2.16(g) (it being understood that the documentation required under Section 2.16(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to

paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Section 2.19 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.15 or 2.16, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.19(b) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)    Regulatory Matters. Notwithstanding any provision in this Agreement to the contrary, no Lender may, directly or indirectly, sell, transfer, assign, or otherwise grant or convey (including, without limitation, by assignment, pledge, hypothecation, loan, participation, derivative or other transaction or arrangement) (a "Transfer") any Loan or any economic or other interest therein, in whole or in part (an "Interest") to any other party, unless such party is, at the time or times of each such Transfer, a Qualified Purchaser. Any Transfer or attempted Transfer that does not comply with all applicable terms and conditions of this Agreement shall be null and void.

SECTION 9.05    Survival. All covenants, agreements, representations and warranties made by the Borrower herein and in any Loan Document or other documents delivered in connection herewith or therewith or pursuant hereto or thereto shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery hereof and thereof and the making of the Term Loans hereunder, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of the making of any Term Loan,

and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied and so long as the Commitments have not expired or been terminated.  The provisions of Sections 2.06(g), 2.14, 2.15, 2.16. 9.03, 9.15 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the payment in full of the Obligations, the expiration or termination the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06    Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)    Electronic Execution of Loan Documents.  The words "execution," "signed," "signature," and words of like import in this Agreement and the other Loan Documents including any Assignment and Assumption shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section, if and to the extent that the enforceability of any provision of this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent then such provision shall be deemed to be in effect only to the extent not so limited.

SECTION 9.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its branches and Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at

any time held, and other obligations (in whatever currency) at any time owing, by such Lender or any such branch or Affiliate, to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender or its branches or Affiliates, irrespective of whether or not such Lender, branch or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.21 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its branches and Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its branches and Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 9.09    Governing Law; Jurisdiction; Etc.

(a)    Governing Law.  This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed and enforced in accordance with, the law of the State of New York.

(b)    Jurisdiction.  The Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court for the Southern District of New York sitting in New York County, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by Applicable Law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

KL2 3279308.20

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4
INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024
Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 95 of 135

(c)    Waiver of Venue.  The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by Applicable Law.

SECTION 9.10    WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11    Headings.    Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12    Treatment of Certain Information; Confidentiality.  Each of the Administrative Agent and the Lenders agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Related Parties in the ordinary course of business (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and directed to keep such Information confidential); (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by Applicable Laws or by any subpoena or similar legal process; (d) to any other party hereto; (e) solely to the extent necessary to exercise any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) subject to the consent of the Borrower (which consent (i) shall not be unreasonably withheld or delayed, (ii) shall be deemed given unless the Borrower shall object by written notice to the Lender within five Business Days after having received notice thereof, and (iii) shall not be required if a Default or Event of Default shall have occurred and be continuing), and to receipt of an agreement containing provisions substantially the same as (or no

- 89 -

less restrictive than) those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (g) with the consent of the Borrower; or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to the Administrative Agent, any Lender, or any of their respective branches or Affiliates on a nonconfidential basis from a source other than the Borrower who did not acquire such information as a result of a breach of this Section.

For purposes of this Section, "Information" means all information received from the Borrower or any of its Subsidiaries relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any of its Subsidiaries; provided that, in the case of information received from the Borrower or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 9.13    PATRIOT Act.  Each Lender subject to the PATRIOT Act hereby notifies the Borrower that, pursuant to the requirements of the PATRIOT Act, it may be required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the PATRIOT Act.

SECTION 9.14    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan or other Obligation owing under this Agreement, together with all fees, charges and other amounts that are treated as interest on such Loan or other Obligation under Applicable Law (collectively, "charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender or other Person holding such Loan or other Obligation in accordance with Applicable Law, the rate of interest payable in respect of such Loan or other Obligation hereunder, together with all charges payable in respect thereof, shall be limited to the Maximum Rate.  To the extent lawful, the interest and charges that would have been paid in respect of such Loan or other Obligation but were not paid as a result of the operation of this Section shall be cumulated and the interest and charges payable to such Lender or other Person in respect of other Loans or Obligations or periods shall be increased (but not above the amount collectible at the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate for each day to the date of repayment, shall have been received by such Lender or other Person.  Any amount collected by such Lender or other Person that exceeds the maximum amount collectible at the Maximum Rate shall be applied to the reduction of the principal balance of such Loan or other Obligation or refunded to the Borrower so that at no time shall the interest and charges paid or payable in respect of such Loan or other Obligation exceed the maximum amount collectible at the Maximum Rate.

KL2 3279308.20

SECTION 9.15    <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent (at the written direction of the Required Lenders)) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.

SECTION 9.16    <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (a) (i) no fiduciary, advisory or agency relationship between the Borrower and its Subsidiaries and the Administrative Agent or any Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether the Administrative Agent or any Lender has advised or is advising the Borrower or any Subsidiary on other matters, (ii) the services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (iii) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate and (iv) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; and (b) (i) the Administrative Agent and the Lenders each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other Person; (ii) none of the Administrative Agent and the Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective branches and Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent and the Lenders has any obligation to disclose any of such interests to the Borrower or its Affiliates.  To the fullest extent permitted by Law, the Borrower hereby waives and releases any claims that it may have against any of the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

By_____
        Moshe Silber

ACQUIOM AGENCY SERVICES LLC,
   as Administrative Agent


By _____
   Name:  Jennifer Anderson
   Title:    Senior Director

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK   Doc 1-1   Filed 07/18/25   Entered 07/18/25 12:43:34   Desc
Exhibit A   Page 100 of 135

**ACQUIOM AGENCY SERVICES LLC,**
as Administrative Agent

By_____
    Name:
    Title:

**CLOVER PRIVATE CREDIT OPPORTUNITIES
ORIGINATION II LP**, as a Lender

By: UBS O'Connor LLC, its investment manager

By_____
    Name: Rodrigo Trelles
    Title: Managing Director

By_____
    Name: Baxter Wasson
    Title: Managing Director

**CLOVER PRIVATE CREDIT OPPORTUNITIES
ORIGINATION (LEVERED) II LP**, as a Lender

By: UBS O'Connor LLC, its investment manager

By_____
    Name: Rodrigo Trelles
    Title: Managing Director

By_____
    Name: Baxter Wasson
    Title: Managing Director

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4
INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Schedule 1.01

### Borrowing Base Schedule

| Specified Real Property Asset | Specified Collateral Value | Specified Collateral Indebtedness | Specified Pledged Percentage | Borrowing Base Contribution |
|---|---|---|---|---|
| 600 Town Center Dearborn, MI 48126 | $38,800,000.00 | $16,574,359.00 | 95% | $11,899,358.95 |
| 4900 Delano Road College Park, GA | $19,000,000.00 | $10,240,000.00 | 59% | $2,365,900.00 |

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 102 of 135

Schedule 2.01

Commitments and Lenders

| Name of Lender | Commitment |
|---|---|
| Clover Private Credit Opportunities Origination II LP | $6,398,000.00 |
| Clover Private Credit Opportunities Origination (Levered) II LP | $13,602,000.00 |
| **TOTAL** | $20,000,000.00 |

KL2 3279308.20

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4
INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Schedule 3.01

<u>Domicile and Primary Residence</u>

41 Powder Horn Drive
Suffern, New York 10901

- 3 -

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 104 of 135

Schedule 3.06

<u>Litigation</u>

None.

KL2 3279308.20

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 105 of 135

Schedule 3.16

<u>Organizational Structure</u>

[See attached]

KL2 3279308.20

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM

NYSCEF DOC. NO. 8

Case 25-01296-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 106 of 135

INDEX NO. 652265/2016

RECEIVED NYSCEF: 05/02/2024

## Mark Silber

Organization Flow Chart



FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO.: 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 107 of 135

Schedule 9.01(a)

<u>Notice Addresses; Administrative Forms</u>

**<u>Notice Addresses</u>**

1.      If to the Administrative Agent:

Acquiom Agency Services LLC
150 South Fifth Street, Suite 2600
Minneapolis, Minnesota 55402
Attention: Jennifer Anderson, Senior Director
Telephone: (612) 509-2321
Email: loanagency@srsacquiom.com); and

2.      If to Clover Private Credit Opportunities Origination (Levered) II LP:

c/o UBS O'Connor LLC
1 North Wacker Drive, 31st Floor
Chicago, IL  60606
Attn: Jeff Richmond
Email: to ol-ocs-reporting@ubs.com

3.      If to Clover Private Credit Opportunities Origination II LP:

c/o UBS O'Connor LLC
1 North Wacker Drive, 31st Floor
Chicago, IL  60606
Attn: Jeff Richmond
Email: to ol-ocs-reporting@ubs.com

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK   Doc 1-1   Filed 07/18/25   Entered 07/18/25 12:43:34   Desc
Exhibit A   Page 108 of 135

## Administrative Details

### Clover Private Credit Opportunities Origination (Levered) II LP

**Legal Name of the Lender to appear on Documentation**

Clover Private Credit Opportunities Origination (Levered) II LP

**Signature Block:**

Clover Private Credit Opportunities Origination (Levered) II LP

By:  UBS O'Connor LLC, as Investment Manager

_____
Name:
Title:

By:  UBS O'Connor LLC, as Investment Manager

_____
Name:
Title:

**Tax ID:**

85-3785068

Note:  no Markit Entity Identifier (MEI) number and no Clearpar settlement

**Credit and Operations Contact:**
(Agent Notices, Borrowings,
Interest, Fees, Amendments, etc.)

Name:  UBS O'Connor LLC (Attn:  Jeff Richmond)
Email:  OL-UBSOC-OPSLOAN@UBS.COM
Phone:  (312) 525-5839
Fax:  (312) 525-6271

With Copy to:
Name:  Jaeho Choi
Email:  Jaeho.choi@ubs.com
Phone:  212-821-5921

With Copy to:
Name:  Joshua Mercado
Email:  joshua.mercado@ubs.com
Phone:  212-713-4040

With Copy to:
Name:  Gregory Najarian
Email:  Gregory.najarian@ubs.com
Phone:  212-713-4041

With Copy to:
Name:  Randal Johnson
Email:  Randal.johnson@ubs.com

KL2 3279308.20

Phone:  212-713-8487

With Copy to:
Name:  Lillyan Kaufmann
Email:  lillyan.kaufmann@ubs.com
Phone:  484-633-0218

With Copy to:
Name:  Alexander Steren
Email:  alexander.steren@ubs.com
Phone:  240-393-3369

With Copy to:
Name:  Peter Blynn
Email:  peter.blynn@ubs.com
Phone:  212-713-9098

| | |
|---|---|
| With Copy to: | HFS_Privates_BLR@ntrs.com |
| **Callback contact:** | Name:   Jeff Richmond    1 312-525-5839<br>Jim Del Medico  1 312-525-5773<br>Anne Clancy       1 312-525-6432<br>Joseph Macku    1 312-525-5905 |
| **Legal Contact:** | Name:  Connor Burke<br>Email:  connor.burke@ubs.com<br>Phone:  (312) 525-5743 |
| **Loan Settlement Contact:** | Email:  OL-UBSOC-OPSLOAN@UBS.COM<br>Attn:  Jeff Richmond<br>Phone:  (312) 525-5839<br>Fax:  (312) 525-6271 |
| **Remittance Instructions:** | Bank Name:  THE NORTHERN TRUST COMPANY<br>ABA#  071-000-152<br>Acct Name:  Clover Private Credit Opportunities Origination (Levered) II LP<br>Acct No.  4497394 |

KL2 3279308.20

## Administrative Details

### Clover Private Credit Opportunities Origination II LP

| | |
|---|---|
| **Legal Name of the Lender to appear on Documentation** | Clover Private Credit Opportunities Origination II LP |

**Signature Block:**　　　　　　　　　Clover Private Credit Opportunities Origination II LP

By:  UBS O'Connor LLC, as Investment Manager

_____
Name:
Title:

By:  UBS O'Connor LLC, as Investment Manager

_____
Name:
Title:

**Tax ID:**　　　　　　　　　　　　 85-1208234

Note:  no Markit Entity Identifier (MEI) number and no Clearpar settlement

**Credit and Operations Contact:**　Name:  UBS O'Connor LLC (Attn:  Jeff Richmond)
(Agent Notices, Borrowings,　　　Email:  OL-UBSOC-OPSLOAN@UBS.COM
Interest, Fees, Amendments, etc.)　Phone:  (312) 525-5839
　　　　　　　　　　　　　　　Fax:   n/a

With Copy to:　　　　　　　　　With Copy to:
　　　　　　　　　　　　　　　Name:  Jaeho Choi
　　　　　　　　　　　　　　　Email:  Jaeho.choi@ubs.com
　　　　　　　　　　　　　　　Phone:  212-821-5921

　　　　　　　　　　　　　　　With Copy to:
　　　　　　　　　　　　　　　Name:  Joshua Mercado
　　　　　　　　　　　　　　　Email:  joshua.mercado@ubs.com
　　　　　　　　　　　　　　　Phone:  212-713-4040

　　　　　　　　　　　　　　　With Copy to:
　　　　　　　　　　　　　　　Name:  Gregory Najarian
　　　　　　　　　　　　　　　Email:  Gregory.najarian@ubs.com
　　　　　　　　　　　　　　　Phone:  212-713-4041

　　　　　　　　　　　　　　　With Copy to:
　　　　　　　　　　　　　　　Name:  Randal Johnson
　　　　　　　　　　　　　　　Email:  Randal.johnson@ubs.com
　　　　　　　　　　　　　　　Phone:  212-713-8487

KL2 3279308.20

With Copy to:
Name:  Lillyan Kaufmann
Email:  lillyan.kaufmann@ubs.com
Phone:  484-633-0218

With Copy to:
Name:  Alexander Steren
Email:  alexander.steren@ubs.com
Phone:  240-393-3369

With Copy to:
Name:  Peter Blynn
Email:  peter.blynn@ubs.com
Phone:  212-713-9098

With Copy to:

HFS_Privates_BLR@ntrs.com

**Callback contact:**           Name:   Jeff Richmond      1 312-525-5839
                                       Jim Del Medico   1 312-525-5773
                                       Anne Clancy        1 312-525-6432
                                       Joseph Macku     1 312-525-5905

**Legal Contact:**              Name:   Connor Burke
                                Email:   connor.burke@ubs.com
                                Phone:   (312) 525-5743

**Loan Settlement Contact:**    Email:  OL-UBSOC-OPSLOAN@UBS.COM
                                Attn:  Jeff Richmond
                                Phone:  (312) 525-5839
                                Fax:  n/a

**Remittance Instructions:**    Bank Name:  THE NORTHERN TRUST COMPANY
                                ABA#  071-000-152
                                Acct Name:  Clover Private Credit Opportunities Origination II LP
                                Acct No.       4492223

KL2 3279308.20

## Administrative Details

Acquoim Agency Services LLC

**Incoming Wiring Instructions**

If they request the Banks address:

Citizens Bank
1 Citizens Dr   ROP-480
Riverside,  RI   02915

Checking Account Title ACQUIOM AGENCY SERVICES LLC

For Domestic Wires, you'll need to provide

Routing number  **011500120**

Account number  **1403276533**

The **SWIFT Code** for **incoming International wires** is: **CTZIUS33**.
(Charles, Tango, Zulu, Indigo, Uncle, Sierra and number 33)

KL2 3279308.20

EXECUTION VERSION

EXHIBIT A

[FORM OF ASSIGNMENT AND ASSUMPTION]

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "Assignor") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "Assignee"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below (including any letters of credit, guarantees, and swingline loans included in such facilities), and (ii) to the extent permitted to be assigned under Applicable Law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "Assigned Interest"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1.    Assignor[s]:    _____

_____

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.
[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.
[3] Select as appropriate.
[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

2.      Assignee[s]:      _____

_____

**[Assignee is an [Affiliate][Approved Fund] of [*identify Lender*]]**

3.      Borrower:  Moshe Silber, an individual

4.      Administrative Agent:  Acquiom Agency Services LLC, as the administrative agent under the Credit Agreement

5.      Credit Agreement:  The Credit Agreement dated as of June 2, 2022 among Moshe Silber, an individual as Borrower, the Lenders parties thereto, Acquiom Agency Services LLC, as Administrative Agent

6.      Assigned Interest[s]:

| Assignor[s] [5] | Assignee[s] [6] | Facility Assigned[7] | Aggregate Amount of Commitment/Loans for all Lenders[8] | Amount of Commitment/Loans Assigned[8] | Percentage Assigned of Commitment/ Loans[9] | CUSIP Number |
|---|---|---|---|---|---|---|
|  |  |  | $ | $ | % |  |
|  |  |  | $ | $ | % |  |
|  |  |  | $ | $ | % |  |

[7.      Trade Date:      _____]10

[Page break]

---

[5] List each Assignor, as appropriate.

[6] List each Assignee, as appropriate.

[7] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment and Assumption.

[8] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[9] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[10] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 115 of 135

-3-

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR[S][11]
[NAME OF ASSIGNOR]


By:_____
   Title:


[NAME OF ASSIGNOR]


By:_____
   Title:


ASSIGNEE[S][12]
[NAME OF ASSIGNEE]


By:_____
   Title:


[NAME OF ASSIGNEE]


By:_____
   Title:


[Consented to and][13] Accepted:

ACQUIOM AGENCY SERVICES LLC, as
   Administrative Agent


By: _____

Title:

---

[11] Add additional signature blocks as needed.
[12] Add additional signature blocks as needed.
[13] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

KL2 3285683.4

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO: 4
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 116 of 135
-2-

[Consented to:][14]

[NAME OF RELEVANT PARTY]

By: _____

Title:

---

[14] To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

KL2 3285683.4

ANNEX 1

[_____]<sup>15</sup>

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT AND ASSUMPTION

1.  Representations and Warranties.

1.1  Assignor[s]. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) it assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents [or any collateral thereunder], (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2  Assignee[s]. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 9.04 of the Credit Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vii) if it is a Foreign Lender<sup>16</sup> attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.  Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts that have accrued to but excluding the Effective

---

<sup>15</sup> Describe Credit Agreement at option of Administrative Agent.
<sup>16</sup> The concept of "Foreign Lender" should be conformed to the section in the Credit Agreement governing withholding taxes and gross-up.

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 118 of 135

Date and to [the][the relevant] Assignee for amounts that have accrued from and after the Effective Date.[17] Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

       3.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

---

[17] The Administrative Agent should consider whether this method conforms to its systems.  In some circumstances, the following alternative language may be appropriate:

"From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignee whether such amounts have accrued prior to, on or after the Effective Date.  The Assignor[s] and the Assignee[s] shall make all appropriate adjustments in payments by the Administrative Agent for periods prior to the Effective Date or with respect to the making of this assignment directly between themselves."

EXHIBIT B

## FORM OF BORROWING REQUEST

[_____], 2022

Reference is made to the Credit Agreement, dated as of June 2, 2022 (as it may be amended, supplemented or otherwise modified, the "Credit Agreement"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Moshe Silber, an individual as Borrower (the "Borrower"), the Lenders party thereto from time to time, Acquiom Agency Services LLC, as administrative agent and collateral agent (collectively, the "Administrative Agent").

Pursuant to Section 2.03 of the Credit Agreement, the Borrower desires that Lenders make the following Loans to the Borrower in accordance with the applicable terms and conditions of the Credit Agreement:

(i)      the aggregate amount of the requested Borrowing:      $[___,___,___]

(ii)     the date of such Borrowing (the "Borrowing Date"):      [_____]

(iii)    Type of Loan:                                           SOFR Loan

(iii)    Wiring instructions:

| | |
|---|---|
| Bank Name: | _____ |
| Bank Address: | _____ |
| ABA Number: | _____ |
| Account Number: | _____ |
| Attention: | _____ |
| Reference: | _____ |

The Borrower hereby certifies that, as of the Borrowing Date:

(a)      no Borrowing Base Deficiency exists;

(b)      the representations and warranties contained in each of the Loan Documents are true and correct in all material respects (or, in the case of any such representation or warranty already qualified by materiality, in all respects) on and as of the Borrowing Date (or, in the case of any such representation or warranty expressly stated to have been made as of a specific date, as of such specific date);

(c)      no Default or Event of Default has occurred and is continuing or would result from the consummation of the borrowing contemplated hereby;

(d)      (i) the Proposed Investment is to be made solely by the Borrower or by a Designated LLC and (ii) no other Person (other than a Designated LLC or other Wholly-Owned Subsidiary of the Borrower) has an interest in such Proposed Investment;

(e)      the statement attached hereto as Schedule I is a true and correct description of the Proposed Investment, and if any information in the statement changes between the date hereof and the Borrowing Date, the Borrower shall promptly notify the Lenders;

(f)      if the Proposed Investment constitutes Margin Stock, the amount of the proceeds of the Term Loan being applied to purchase the Margin Stock does not exceed 50% of the fair market value of such Margin Stock; and

(g)     if the Proposed Investment is not a Proposed Cash Investment, the legal organizational chart attached hereto as <u>Schedule II</u> shows the ownership structure of the Proposed Investment.

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM INDEX NO. 652265/2024
NYSCEF DOC. NO. 4 RECEIVED NYSCEF: 05/02/2024

**Moshe Silber**

_____

Name: Moshe Silber

Schedule I
Description of the Proposed Investment

[Attached][18]

---

[18] NTD: Such description should include the information set forth in Section 2.03(b) of the Credit Agreement.

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024

RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 123 of 135

Schedule II

Legal Organizational Chart

[Attached]

EXHIBIT C

## FORM OF BORROWING BASE CERTIFICATE

[_____], 2022

Reference is made to the Credit Agreement, dated as of June 2, 2022 (as it may be amended, supplemented or otherwise modified, the "Credit Agreement"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Moshe Silber, an individual as Borrower (the "Borrower"), the Lenders party thereto from time to time, Acquiom Agency Services LLC, as administrative agent and collateral agent (collectively, the "Administrative Agent").

The Borrower certifies that the attached Borrowing Base Certificate is true, correct and complete.

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
INDEX NO. 652265/2024
NYSCEF DOC. NO: 4
RECEIVED NYSCEF: 05/02/2024

**Moshe Silber**

_____

Name: Moshe Silber

Schedule I
Borrowing Base Certificate

*The Borrowing Base as of the Closing Date has been calculated as follows:*

For [name of Specified Real Property Asset]:

(A)    Specified Collateral Value[19]:                                               $[•]

(B)    Specified Collateral Indebtedness[20]:                                  $[•]

(C)    Specified Pledged Percentage[21]:                                       [•]%

(D)    **RESULT** equals:

    (i)    the excess of 75% of (A) over (B)

    multiplied by

    (ii)    (C)                                                                          $[•]

---

[19] The Specified Collateral Value shall be the value specified on the Borrowing Base Schedule attached as Schedule 1.01 to the Credit Agreement.

[20] The Specified Collateral Indebtedness shall be the outstanding principal amount of all Indebtedness specified on the Borrowing Base Schedule attached as Schedule 1.01 to the Credit Agreement.

[21] The Specified Pledged Percentage shall be the aggregate beneficial equity ownership of the Borrower specified on the Borrowing Base Schedule attached as Schedule 1.01 to the Credit Agreement.

KL2 3285683.4

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 127 of 135

## Exhibit C - Form of Borrowing Base Certificate

| Specified Real Property Asset | Specified Collateral Value | Borrowing Base Haircut Adjustment | Adjusted Specified Collateral Value | Specified Collateral Indebtedness | Net Adjusted Specified Collateral Value | Specified Pledged Percentage | Borrowing Base Contribution |
|---|---|---|---|---|---|---|---|
| 600 Town Center Dearborn, MI 48126 | $ 38,800,000.00 | 75.0% | $ 29,100,000.00 | $ 16,574,359.00 | $ 12,525,641.00 | 95% | $ 11,899,358.95 |
| 4900 Delano Road College Park, GA | $ 19,000,000.00 | 75.0% | $ 14,250,000.00 | $ 10,240,000.00 | $ 4,010,000.00 | 59% | $ 2,365,900.00 |
| [Other] | $ - | 75.0% | $ - | $ - | $ - | [TBD] | $ - |
| [Other] | $ - | 75.0% | $ - | $ - | $ - | [TBD] | $ - |
| **Total** | **$ 57,800,000.00** | | **$ 43,350,000.00** | **$ 26,814,359.00** | **$ 16,535,641.00** | | **14,265,258.95** |

**Total Borrowing Base**    $ 14,265,258.95

## Supporting Information for Specified Collateral Value

| Specified Real Property Asset | Valuation Reference File[1] | Date of File |
|---|---|---|
| 600 Town Center Dearborn, MI 48126 | DTW220311 Hayatt Redevelopment PDF 0510 dja V2 | 05/10/2022 |
| 4900 Delano Road College Park, GA | Freedom Park B&F LOI _5.3.22jbsigned | 05/03/2022 |
| [TBD] | [TBD] | [TBD] |
| [TBD] | [TBD] | [TBD] |

1. Title of Valuation Reference File sent to Lenders

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024

RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 128 of 135

EXHIBIT D-1

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of June 2, 2022 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Moshe Silber, an individual as Borrower, Acquiom Agency Services LLC, as Administrative Agent, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.16 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:_____
Name:
Title:

Date: _____ __, 20[  ]

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4

INDEX NO. 652265/2024

RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 129 of 135

EXHIBIT D-2

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of June 2, 2022 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Moshe Silber, an individual as Borrower, Acquiom Agency Services LLC, as Administrative Agent, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.16 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

KL2 3285683.4

EXHIBIT D-3

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of June 2, 2022 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Moshe Silber, an individual as Borrower, Acquiom Agency Services LLC, as Administrative Agent, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.16 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM
NYSCEF DOC. NO. 4
INDEX NO. 652265/2024
RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK    Doc 1-1    Filed 07/18/25    Entered 07/18/25 12:43:34    Desc
Exhibit A    Page 131 of 135

EXHIBIT D-4

FORM OF

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of June 2, 2022 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Moshe Silber, an individual as Borrower, Acquiom Agency Services LLC, as Administrative Agent, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.16 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

EXHIBIT E

FORM OF

PERSONAL FINANCIAL STATEMENT


[See attached]

**Exhibit E - Personal Financial Statement of Mark Silber**

Mark Silber Balance Sheet as of [3/31/2022]

| % Owned | Item Type | Reference Schedule | Collateral | Stated Gross Value | Debt | Net Equity | LTV |
|---|---|---|---|---|---|---|---|
| | **Cash** | | **Cash & Equivalents** | **66,612,872** | **-** | **66,612,872** | **0** |
| 100.0% | Cash | Schedule of Accounts (E(i)) | Unrestricted Cash | 12,265,643 | - | 12,265,643 | 0.0% |
| 100.0% | Cash | Schedule of Accounts (E(i)) | CBRM Unrestricted Cash | 54,347,230 | - | 54,347,230 | 0.0% |
| | **Marketable Securities** | | **Other Liquid Assets** | **1,904,619** | **-** | **1,904,619** | **0.0%** |
| 100.0% | Listed Securities | Schedule of Accounts (E(i)) | Listed Securities | 1,904,619 | - | 1,904,619 | 0.0% |
| | **Other Assets** | | **Other Assets** | **325,478,217** | **143,350,000** | **182,128,217** | **44.0%** |
| 100.0% | Companies | | JM Realty Advisory LLC (CBRM) | 186,970,000 | - | 186,970,000 | 0.0% |
| 100.0% | Companies | | Rapid Services LLC | 74,410,380 | - | 74,410,380 | 0.0% |
| 100.0% | Companies | | CBRM Realty | | 100,000,000 | (100,000,000) | #DIV/0! |
| 100.0% | Aircraft | | Private Jets | 61,100,000 | 43,350,000 | 17,750,000 | 70.9% |
| 100.0% | Cars, Jewelry, Other | Schedule of Accounts (E(i)) | Other Assets | 2,997,837 | - | 2,997,837 | 0.0% |
| | **Real Estate** | | **Real Estate** | **916,708,294** | **545,671,558** | **371,036,736** | **59.5%** |
| 100.0% | Real Estate - Personal | | 1092 Haverstraw Road, Suffern, NY | 6,500,000 | 1,000,000 | 5,500,000 | 15.4% |
| 100.0% | Real Estate - Personal | | 28-36 Powder Horn Drive, Suffern, NY | 3,000,000 | - | 3,000,000 | 0.0% |
| 100.0% | Real Estate - Personal | | 41 Powder Horn Drive, Suffern, NY | 3,000,000 | - | 3,000,000 | 0.0% |
| 100.0% | Real Estate - Personal | | 37 Woodlands Close, London, NW11 9QR | 1,579,156 | 393,114 | 1,186,042 | 24.9% |
| 65.0% | Real Estate - Investments | | 600 Pavonia Ave., Jersey City, NJ | 28,000,000 | 19,773,564 | 8,226,436 | 70.6% |
| 60.0% | Real Estate - Investments | | 4900 Deleno Road, College Park, GA | 19,000,000 | 10,240,000 | 8,760,000 | 53.9% |
| 20.0% | Real Estate - Investments | | 200-219 West 145th St | 40,800,000 | 22,934,400 | 17,865,600 | 56.2% |
| 72.0% | Real Estate - Investments | | 100 Franklin Square Dr. Somerset, NJ | 19,500,000 | 10,391,478 | 9,108,522 | 53.3% |
| 50.0% | Real Estate - Investments | | 515 West 156th St., New York, NY | 13,500,000 | 6,598,717 | 6,901,283 | 48.9% |
| 50.0% | Real Estate - Investments | | 100 West 143rd St., New York, NY | 13,200,000 | 8,797,032 | 4,402,968 | 66.6% |
| 20.0% | Real Estate - Investments | | RH 507-517 West 171 Street LLC | 25,500,000 | 9,743,666 | 15,756,334 | 38.2% |
| 50.0% | Real Estate - Investments | | 118 West 137th St., New York, NY | 8,750,000 | 4,612,342 | 4,137,658 | 52.7% |
| 33.3% | Real Estate - Investments | | 912 Saratoga Ave., Brooklyn, NY | 12,300,000 | 6,644,721 | 5,655,279 | 54.0% |
| 50.0% | Real Estate - Investments | | 2546 7th Avenue, New York, NY | 8,000,000 | 4,382,254 | 3,617,746 | 54.8% |
| 50.0% | Real Estate - Investments | | 220-222 West 149th St., New York, NY | 7,200,000 | 4,084,786 | 3,115,214 | 56.7% |
| 20.0% | Real Estate - Investments | | 532-536 West 143rd St., New York, NY | 17,800,000 | 9,930,119 | 7,869,881 | 55.8% |
| 100.0% | Real Estate - Investments | | 19 Mile Road., Suffern, NY | 3,500,000 | 852,389 | 2,647,611 | 24.4% |
| 20.0% | Real Estate - Investments | | 150 West 140th St. New York, NY | 17,100,000 | 10,282,766 | 6,817,234 | 60.1% |
| 50.0% | Real Estate - Investments | | 210 West 133th St. New York, NY | 6,800,000 | 3,223,988 | 3,576,012 | 47.4% |
| 20.0% | Real Estate - Investments | | 608-614 West 189th St. New York, NY | 14,800,000 | 6,498,769 | 8,301,231 | 43.9% |
| 50.0% | Real Estate - Investments | | 534 West 159th St., New York, NY | 5,400,000 | 3,490,789 | 1,909,211 | 64.6% |
| 50.0% | Real Estate - Investments | | 243 West 135th St., New York, NY | 5,100,000 | 2,413,555 | 2,686,445 | 47.3% |
| 50.0% | Real Estate - Investments | | 528 West 159th St., New York | 4,500,000 | 2,420,093 | 2,079,907 | 53.8% |
| 50.0% | Real Estate - Investments | | 22 Bradhurst Avenue, New York, NY | 4,400,000 | 2,496,807 | 1,903,193 | 56.7% |
| 50.0% | Real Estate - Investments | | 530 West 159th St., New York, NY | 4,000,000 | 2,415,401 | 1,584,599 | 60.4% |
| 50.0% | Real Estate - Investments | | 532 West 159th St., New York, NY | 4,400,000 | 2,391,941 | 2,008,059 | 54.4% |
| 50.0% | Real Estate - Investments | | 536 West 159th St., New York, NY | 2,800,000 | 1,429,197 | 1,370,803 | 51.0% |
| 50.0% | Real Estate - Investments | | 538 West 159th St., New York, NY | 3,100,000 | 1,429,197 | 1,670,803 | 46.1% |
| 20.0% | Real Estate - Investments | | 608 West 191st St., New York, NY | 8,600,000 | 3,381,715 | 5,218,285 | 39.3% |
| 100.0% | Real Estate - Investments | | 27 Lime Kiln Road, Wesley Hills, NY | 1,028,000 | 439,916 | 588,084 | 42.8% |
| 100.0% | Real Estate - Investments | | 14 S Myrtle Avenue., Spring Valley, NY | 559,000 | 159,964 | 399,036 | 28.6% |
| 100.0% | Real Estate - Investments | | 16 S Myrtle Ave., Spring Valley, NY | 560,000 | 141,855 | 418,145 | 25.3% |
| 60.0% | Real Estate - Investments | | 1704 E New York Ave., Brooklyn, NY | 950,000 | 606,233 | 343,767 | 63.8% |
| 100.0% | Real Estate - Investments | | 11 Brook St. Suffern, NY | 315,000 | 141,167 | 173,833 | 44.8% |
| 100.0% | Real Estate - Investments | | 97 Gurnee Ave., Haverstraw, NY | 300,000 | 119,356 | 180,644 | 39.8% |
| 100.0% | Real Estate - Investments | Schedule of CBRM Properties (E(ii)) | CBRM Property Interest | 600,867,138 | 381,810,268 | 219,056,870 | 63.5% |
| | | | **Total** | **1,310,704,002** | **689,021,558** | **621,682,444** | **52.6%** |

**Exhibit E - Personal Financial Statement of Mark Silber**

| | Mark Silber Balance Sheet as of [3/31/2022] |
|---|---|

**Schedule of Accounts**

**Cash & Cash Equivalents**

| Institution | Account Name | Account # | Closing Balancing | Statement Date |
|---|---|---|---|---|
| Signature Bank | Moshe Silber | 8090 | $ 2,216,873.52 | 03/31/2022 |
| Key Bank | Moshe Silber | 2620 | $ 10,048,769.24 | 03/31/2022 |
| Key Bank | CBRM Realty | 9915 | $ 2,175,000.00 | 03/31/2022 |
| Signature Bank | CBRM Realty | 4767 | $ 16,000,000.00 | 03/31/2022 |
| Signature Bank | CBRM Realty | 3444 | $ 32,371,680.51 | 03/31/2022 |
| Signature Bank | Crown Capital | 3820 | $ 3,800,549.02 | 03/31/2022 |
| **Total** | | | **$ 66,612,872.29** | |

**Marketable Securities**

| Institution | Account Name | Account # | Value | Ticker[1] | Position | Statement Date |
|---|---|---|---|---|---|---|
| RBC | Moshe Silber | 947 | $ 325,079.35 | VLY | 18,371.00 | 03/31/2022 |
| RBC | Moshe Silber | 947 | $ 20,150.00 | DBKSF | 500,000.00 | 03/31/2022 |
| RBC | Moshe Silber | 947 | $ 32,079.00 | NXTP | 149,000.00 | 03/31/2022 |
| RBC | Moshe Silber | 949 | $ 1,527,310.40 | SNNY | 77,924.00 | 03/31/2022 |
| **Total** | | | **$ 1,904,618.75** | | **745,295.00** | |

1. If cryptocurrency, denote the name of the coin

**Other**

| Institution | Account Name | Account # | Value | Statement Date |
|---|---|---|---|---|
| Life Insurance Policies | Multiple Carriers | Mutlitple Accounts | $ 797,837.24 | 03/31/2022 |
| Jewelry | Jewelry | N/A | $ 700,000.00 | 03/31/2022 |
| Cars | Cars | N/A | $ 1,500,000.00 | 03/31/2022 |
| [Other] | [xxx] | [xxx] | $ - | 03/31/2022 |
| **Total** | | | **$ 2,997,837.24** | |

FILED: NEW YORK COUNTY CLERK 05/02/2024 11:24 AM — INDEX NO. 652265/2024
NYSCEF DOC. NO. 4 — RECEIVED NYSCEF: 05/02/2024

Case 25-01295-MBK   Doc 1-1   Filed 07/18/25   Entered 07/18/25 12:43:34   Desc
Exhibit A   Page 135 of 135

**Exhibit E - Personal Financial Statement of Mark Silber**

**Mark Silber Balance Sheet as of [3/31/2022]**

**CBRM Portfolio as of [3/31/2022]**

| Property Names | Contribution as Promote CBRM % | Address | City | State | Zip | Appraisal Date | As-is Value | Debt Balance | Cash Deposits | Net Debt | As-is Equity | Gross LTV | Net LTV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carmel Brook | 100.0% | 12345 I-10 Service Rd | New Orleans | LA | 70128 | 08/14/2019 | 44,800,000 | 25,285,000 | 54,103 | 25,230,897 | 19,569,103 | 56.4% | 56.3% |
| Carmel Spring | 100.0% | 12151 I-10 Service Rd | New Orleans | LA | 70128 | 08/14/2019 | 27,000,000 | 13,447,106 | 22,556 | 13,424,550 | 13,575,450 | 49.8% | 49.7% |
| Laguna Creek | 100.0% | 6881 Parc Brittany Blvd | New Orleans | LA | 70126 | 08/14/2019 | 16,100,000 | 7,975,299 | 30 | 7,975,270 | 8,124,730 | 49.5% | 49.5% |
| Laguna Reserve | 100.0% | 5131 Bundy Rd | New Orleans | LA | 70127 | 08/14/2019 | 25,700,000 | 14,080,610 | 14,405 | 14,066,205 | 11,633,795 | 54.8% | 54.7% |
| Laguna Run | 100.0% | 7001 Martin Dr | New Orleans | LA | 70126 | 11/10/2020 | 34,100,000 | 22,400,000 | 32,661 | 22,367,339 | 11,732,661 | 65.7% | 65.6% |
| Summerset | 100.0% | 16801 Larkspur Ln | Independence | MO | 64055 | 10/14/2020 | 33,500,000 | 22,500,000 | 171,059 | 22,328,941 | 11,171,059 | 67.2% | 66.7% |
| Williamsburg of Cincinnati | 70.0% | 200 W Galbraith Rd | Cincinnati | OH | 45215 | 03/15/2019 | 99,500,000 | 74,250,000 | 30,403 | 74,219,597 | 25,280,403 | 74.6% | 74.6% |
| Orwood Creek | 89.0% | 10151 Curran Blvd | New Orleans | LA | 70127 | 03/25/2021 | 13,500,000 | 9,750,000 | 29,115 | 9,720,885 | 3,779,115 | 72.2% | 72.0% |
| Country Club Manor | 100.0% | 1930 Woodslea Dr | Flint | MI | 48507 | 03/23/2021 | 8,210,000 | 6,078,000 | 978 | 6,077,022 | 2,132,978 | 74.0% | 74.0% |
| Bridgeport Portfolio | 100.0% | Multiple Addresses | Bridgeport | CT | 06606 | 2021 & 12/31/2017 | 40,800,000 | 28,825,372 | 1,124 | 28,824,247 | 11,975,753 | 70.7% | 70.6% |
| Alta Sita Apartments | 100.0% | 3408 Converse Ave | East St Louis | IL | 62207 | 03/16/2021 | 3,400,000 | 2,143,000 | 631 | 2,142,369 | 1,257,631 | 63.0% | 63.0% |
| Rosehaven Manor | 100.0% | 3900 Hammerberg Rd | Flint | MI | 48507 | 03/23/2021 | 12,470,000 | 8,050,000 | 5,046 | 8,044,954 | 4,425,046 | 64.6% | 64.5% |
| Alcazar Apartments | 100.0% | 3906 Baltimore Ave | Kansas City | MO | 64111 | 03/09/2021 | 12,100,000 | 10,499,000 | 17,888 | 10,481,112 | 1,618,888 | 86.8% | 86.6% |
| Columbia Square | 100.0% | 316 Chewaica Dr | Rainbow City | AL | 35906 | 03/27/2021 | 5,600,000 | 3,315,000 | 17,192 | 3,297,808 | 2,302,192 | 59.2% | 58.9% |
| Sycamore Meadows | 100.0% | 1273 Stamford Ct | Ypsilanti | MI | 48198 | 01/10/2022 | 44,600,000 | 27,000,000 | 40,119 | 26,959,881 | 17,640,119 | 60.5% | 60.4% |
| Green Meadows | 100.0% | 1610 Edgewood Dr | Danville | IL | 61832 | 06/18/2021 | 9,400,000 | 7,348,000 | 3,503 | 7,344,497 | 2,055,503 | 78.2% | 78.1% |
| Chapel Ridge | 100.0% | 1636 Raymond Rd | Jackson | MS | 39204 | 05/11/2021 | 10,600,000 | 8,480,000 | 18,219 | 8,461,781 | 2,138,219 | 80.0% | 79.8% |
| Slidell | 100.0% | 2201 W Carpenter Rd | Flint | MI | 48505 | 03/04/2022 | 11,200,000 | — | 306,493 | (306,493) | 11,506,493 | 0.0% | -2.7% |
| Highland Park | 100.0% | 2301 Southeast Bellview Ave | Topeka | KS | 66605 | 07/13/2021 | 8,500,000 | 7,760,000 | 99,443 | 7,660,557 | 839,443 | 91.3% | 90.1% |
| Evergreen Regency | 100.0% | 3102 Fox Circle | Flint | MI | 48507 | 09/10/2020 | 33,450,000 | 24,590,000 | 280,355 | 24,309,645 | 9,140,355 | 73.5% | 72.7% |
| Woodside Meadows | 100.0% | 4590 Seaway Dr | Lansing | MI | 48911 | 01/28/2022 | 45,800,000 | 37,000,000 | 181,126 | 36,818,874 | 8,981,126 | 80.8% | 80.4% |
| Covington Park | 100.0% | 100 Covington Park Dr<br>2080 N Liebelt Blvd & | Jackson | MS | 39212<br>70806 | 05/11/2021 | 11,300,000 | 7,947,000 | 189,588 | 7,757,412 | 3,542,588 | 70.3% | 68.6% |
| Copper Ridge & Magnolia Trace | 100.0% | 11585 North Harrells Ferry Rd | Baton Rouge | LA | 70816 | 07/21/2021 | 44,400,000 | 23,088,000 | 241,416 | 22,846,584 | 21,553,416 | 52.0% | 51.5% |
| Westgate Manor | 100.0% | 3651 Balfour Court | Flint | MI | 48507 | 01/19/2022 | 9,200,000 | — | 13,571 | (13,571) | 9,213,571 | 0.0% | -0.1% |
| Ascot Place | 66.5% | 540-544 Gadsden Hwy | Birmingham | AL | 35235 | 10/23/2019 | 27,500,000 | 15,326,926 | 79 | 15,326,847 | 12,173,153 | 55.7% | 55.7% |
| Elora Place | 9.7% | 3606 Kaliste Saloom Rd | Lafayette | LA | 70508 | 06/26/2020 | 34,100,000 | 21,958,000 | 188,326 | 21,769,674 | 12,330,326 | 64.4% | 63.8% |
| New Horizon | 9.8% | 3619 Kings Gate Dr | Memphis | TN | 38116 | 11/05/2021 | 45,600,000 | 21,300,000 | 987,262 | 20,312,738 | 25,287,262 | 46.7% | 44.5% |
| Onyx at 600 | 9.5% | 600 Earline Cir | Birmingham | AL | 35215 | 03/09/2020 | 9,500,000 | 8,500,000 | 394 | 8,499,606 | 1,000,394 | 89.5% | 89.5% |
| **Total** | | | | | | | **723,930,000** | **458,896,313** | **2,947,085** | **455,949,228** | **265,980,772** | **63.5%** | **63.5%** |
| **CBRM Property Interest** | | | | | | | **600,867,138** | **383,684,263** | **1,873,995** | **381,810,268** | **219,056,870** | **63.9%** | **63.5%** |